**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**


**ANGELO L. DILUZIO,**

    **Plaintiff,**

  **v.**            **Civil Action 2:11-cv-1102
                 Judge Michael H. Watson
                 Magistrate Judge Jolson**

**THE VILLAGE OF YORKVILLE,
OHIO, et al.,**

    **Defendants.**


## REPORT AND RECOMMENDATION AND ORDER

   This matter is before the Court on Plaintiff's Motion to Compel Discovery and for Sanctions against the Village of Yorkville, Ohio, Mayor John "Jake" DiFilippo, and Fire Chief Kevin Klubert (collectively "Defendants").[1]  (Doc. 241).  Also pending is Defendants' Motion for Leave to file a Supplemental Memorandum in Opposition to the Motion to Compel Discovery and for Sanctions.  (Doc. 275).  For the reasons set forth below, Defendants' Motion for Leave to file a Supplemental Memorandum in Opposition is GRANTED, the Motion to Compel Discovery is DENIED as MOOT, and it is RECOMMENDED that the Motion for Sanctions be GRANTED, and that default judgment on liability be entered as to all Defendants, with the exception of Police Chief Morelli.  Finally, Defendants and their counsel are ORDERED to pay jointly and severally the reasonable expenses, including attorney's fees, incurred in connection with the Motion for Sanctions.

---

   [1]Plaintiff is not seeking sanctions against Police Chief Morelli.  (Doc. 324, PAGEID #: 10238).

# I.     BACKGROUND

At the heart of this case is a fire—one that, according to Plaintiff's allegations, started under mysterious circumstances in the early morning hours of August 18, 2010.  But, as set forth below, the events relevant to the pending motions began well before and extend well after that date.

## A.     The Public Road Property

In the 1930s, Plaintiff's grandfather purchased property located on Public Road in the Village of Yorkville, Ohio (the "Village").  (Doc. 2 ¶ 10).  Plaintiff eventually acquired the property, which he considered "the most significant and valuable" of his many real estate holdings.  Located less than a block away from the Village's municipal building, the Public Road property consisted of three contiguous brick buildings containing residential and retail space. (Doc. 278-1, PAGEID #: 9404; Doc. 2 ¶¶ 11–14).  Known as the south building, the middle building, and the north building, the buildings were two-stories high, separated by fire walls, and connected by a trussed roof.  (Doc. 2 ¶ 11).  At the time of the fire, Plaintiff and his wife lived in an apartment on the second floor of the middle building and maintained a real estate office in the south building, which was "by far the largest" of the three.  (*Id*. ¶¶ 12–13).

In January 2010, Valerie Klubert approached Plaintiff about his property.  (Doc. 72-1, PAGEID #: 1462–63).  A key character in this matter, Mrs. Klubert was a Village Council Member, a Village Firefighter, and a Village EMT, who was married to Village Fire Chief Kevin Klubert, also an important witness and a named defendant in this case.  According to Plaintiff's side of the story, Mrs. Klubert represented to Plaintiff that her relative, William Swoyer, wanted to reopen the laundromat that once existed on the ground floor of the middle building.  (*Id*., PAGEID #: 1462–63, 1571–73).  Mrs. Klubert added that the Village needed Mr. Swoyer as an

EMT.  (*Id*.).  Plaintiff understood that Mrs. Klubert's proposal "not only would help the Village with the laundromat, it would help the Village with the fire department."  (*Id*., PAGEID #: 1572).  So when Mr. Swoyer approached Plaintiff about reopening the laundromat, Plaintiff agreed.  (Doc. 2 ¶ 17).

Mr. Swoyer began installing washers and dryers on April 16, 2010.  (*Id*.).  Plaintiff alleges that Fire Chief Klubert was there, too, purportedly helping his relative.  (Doc. 72-1, PAGEID #: 1464–67).  Plaintiff has explained that, although it wasn't his typical practice, he left the door leading to the basement of the middle building unlocked during the weekend of April 16–18, 2010, at Mr. Swoyer's request, to allow him access to the electrical outlets for the laundromat.  (Doc. 2 ¶ 18; *see also* Doc. 72-1, PAGEID #: 1573).

### B.      The April 18, 2010 Fire

A fire began in the basement of the middle building early in the morning on April 18, 2010, while Plaintiff and his wife were in their second-floor apartment.  (*Id*. ¶¶ 19–20).  When smoke began entering their apartment at 3:18 a.m., Mrs. DiLuzio called 9-1-1.  (*Id*. ¶ 20).

#### 1.      The Kluberts

Plaintiff alleges that, immediately after making the 9-1-1 call, he and his wife descended the stairs to the back patio of the middle building and "came face-to-face with Yorkville Fire Chief Kevin Klubert" who was alone in plain clothes and "very clearly and obviously intoxicated."  (*Id*. ¶ 21).

But the Kluberts tell a very different story.  During her deposition, Mrs. Klubert testified that she was in bed with her husband at 3:18 a.m. when the sound of a pager woke her.  (Doc. 72-3, PAGEID #: 2121, 2125, 2132).  She then woke her husband.  (*Id*., PAGEID #: 2132).  After she got ready, she backed the car out of the garage and drove it around front, where she

picked up her husband.  (*Id.*, PAGEID #: 2132, 2136).  Mrs. Klubert then drove to the intersection of Public Road and Williams Street and dropped off her husband.  (*Id.*, PAGEID #: 2136).  Fire Chief Klubert also testified that he was in bed with his wife the morning of the fire; however, he testified that he woke before his wife.  (Doc. 72-4, PAGEID #: 2263).  Fire Chief Klubert otherwise repeated his wife's version of events—she pulled the car to the front of the house, picked him up, and then drove him to the intersection of Public Road and Williams Street. (*Id.*, PAGEID #: 2272–74).

If Plaintiff's testimony is to be believed, Fire Chief Klubert was already at the Public Road property when Mrs. DiLuzio placed the 9-1-1 call.  (Doc. 2 ¶ 21).  The Kluberts' testimony, however, alleges the opposite—Fire Chief Klubert was not and could not have been on the property either before or immediately after the 9-1-1 call.  (Doc. 72-3, PAGEID #: 2125–26).  Thus, where Fire Chief Klubert was when the fire began is disputed, but Plaintiff has "concluded that Kevin Klubert . . . set the fire[.]"  (Doc. 307 at 2).

Fire Chief Klubert's physical condition the morning of the fire also remains a mystery. Both he and Mrs. Klubert have admitted that he had been drinking at the fire station the evening before the fire, but the parties dispute the extent to which his intoxication impaired his judgment. (*See, e.g.*, Doc. 72-3, PAGEID #: 2127, 2130).

### 2. Fighting—Or Not Fighting—The Fire And Allegedly Unnecessary Medical Treatment

Two fire trucks arrived at the scene, the first at 3:27 a.m. and the second at 3:33 a.m. (Doc. 2 ¶ 22).  Plaintiff claims that, as the trucks arrived, he asked the firefighters to enter and flood the basement of the middle building to extinguish the fire.  (*Id.*).  Plaintiff alleges that the firefighters were about to do so when Fire Chief Klubert ordered them to "get out" of the

4

basement area "before the hose was turned on."  (*Id.* ¶ 23).  As the basement burned, Plaintiff proposed an alternative way to extinguish the fire, telling Fire Chief Klubert that the firefighters could flood the basement without entering the building by using a vent in the front.  (*Id.* ¶ 24).  Plaintiff claims that, despite repeatedly begging Fire Chief Klubert and others to fight the fire, they simply stood by.  (*Id.*; Doc. 307 at 4).

Plaintiff further claims that his continued pleas led Mrs. Klubert, Fire Chief Klubert, and others to devise a plan to have him removed from the scene.  (Doc. 307 at 4).  The plan, Plaintiff alleges, went into action after he had a minor stumble.  (Doc. 72-1, PAGEID #: 1624, 1627).  Plaintiff testified that he hit his knee to his chest as he stumbled and, as he stood up, he rubbed his chest.  (*Id.*).  Seeing this, Mrs. Klubert, an EMT, insisted that Plaintiff needed medical attention.  (*Id.*, PAGEID #: 1625).  Plaintiff agreed to go to the ambulance, which was already present at the scene, to allow Mrs. Klubert to take his blood pressure.  (*Id.*, PAGEID #: 1626).  Mr. Swoyer, a paramedic and the same man working to re-open the laundromat, and Mr. Swoyer's son, an EMT-Intermediate, were there as well.  (*Id.*, PAGEID #: 1462, 1626–27).  Plaintiff claims they refused to share his blood pressure reading with him but insisted he needed hospital care.  (*Id.*, PAGEID #: 1625–28).  According to Plaintiff's allegations, Mrs. Klubert, Mr. Swoyer, and Mr. Swoyer's son refused to let him leave the ambulance, claiming they were unable to find the forms to release him.  (*Id.*, PAGEID #: 1628–29).

Plaintiff believed a hospital trip was unnecessary but reluctantly agreed to go when they were unable to find the release forms.  (*Id.*, PAGEID #: 1629).  Plaintiff testified, "[a]t that point, I figured just go get looked at and get the hell back."  (*Id.*).  Despite Mrs. Klubert's insistence that Plaintiff needed immediate medical treatment, she did not accompany Plaintiff to the hospital but instead stayed at the scene, where no water was being sprayed on the building.

5

(Doc. 72-3, PAGEID #: 2151; Doc. 72-1, PAGEID #: 1630). At the hospital, Plaintiff's blood pressure reading was normal, and he was released. (Doc. 72-1, PAGEID #: 1623–64). Plaintiff estimates he was at the hospital for forty minutes. (*Id.*, PAGEID #: 1624).

### 3. The Fire Damage

By the time Plaintiff returned to the scene, the fire had spread to the roof of the middle building. (Doc. 307 at 5). Plaintiff clams that, for more than two hours, Fire Chief Klubert and other Village officials refused to spray water on the fire. (Doc. 2 ¶ 25). In his Complaint, Plaintiff describes how the fire spread:

> When the fire went up from the Middle Building basement to the flat building roof, it also burned portions of the elevated trussed roof above it. This second roof extended over all three of the . . . adjoining brick buildings, so the fire did some damage to parts of the elevated roof over the South and North Buildings, as well as the Middle Building, before it was finally extinguished.

(Doc. 2 ¶ 27). The fire was extinguished in the morning hours of April 18, 2010. (*Id.* ¶ 28).

Plaintiff claims that, other than roof damage, the fire damage was restricted entirely to the middle building. (*Id*. ¶ 27). Significantly, Plaintiff claims that the south building—the largest building which housed his office, a beauty salon, and residential apartments—was virtually unharmed. (*Id*. ¶¶ 12, 27). In fact, Plaintiff alleges that "[a]ll three buildings could have been repaired and returned to service in a matter of weeks, at a reasonable expense, after the fire." (*Id*. ¶ 27). Those repairs never happened.

### C. The Alleged Involuntary Meeting And Destruction Of The South Building

Plaintiff alleges that, a few hours after the fire, Officer Jerry Davis took him against his will to the Village's municipal building in a police cruiser. (*Id*. ¶¶ 29–31). Waiting there were Fire Chief Klubert, Assistant Fire Chief Jim Dailey, Fire Marshal John Weber, and demolition contractor Greg Nemeth. (*Id*. ¶ 32). Plaintiff states that, immediately after his arrival, Fire Chief

Klubert yelled "the mayor wants that building down," but Plaintiff made it "explicitly clear to everyone present that he was not going to agree to demolish, or let anyone else demolish, any of his three buildings at that complex." (*Id*. ¶ 33). Instead, Plaintiff planned to have experts inspect the property and submit plans for repairs. (*Id*. ¶ 34).

Plaintiff claims that immediately following that meeting, which lasted only minutes, demolition began. (*Id*. ¶ 47). Plaintiff believes that Village officials had planned this demolition all along, and they contacted Mr. Nemeth as early as 6:00 a.m. that morning (not even three hours after the fire began). (*Id*. ¶ 48). Plaintiff further explains that:

> [a]mazingly, the Village did not instruct Mr. Nemeth to use his equipment to demolish the Middle Building, where the fire had occurred and where some modest fire damage did exist. The laundromat building was not knocked down by the Village demolition crew. It was left standing in its damaged condition, and it remained there for years thereafter. Instead, on instructions from the Village, Mr. Nemeth's equipment slowly and painstakingly smashed into the large South Building, foot by foot, and tore it down from one end to the other. This demolition job took hours to complete. When Mr. Nemeth finished, the entire South Building had been knocked down and reduced to rubble, except for a part of the brick wall facing the Middle Building, which remained standing. After completing the destruction of the South Building, Mr. Nemeth moved his equipment and, for no apparent reason, gratuitously knocked off the corner of the Middle Building, opening it to the elements.

(*Id*. ¶ 50). Plaintiff characterizes these actions to demolish the south building as "inexplicable," given that it was virtually unharmed. (*Id*. ¶ 51). Plaintiff also claims these actions were a violation of the Yorkville Nuisance Abatement Ordinance, which required, *inter alia*, prior notice of the demolition. (*Id*. ¶ 56).

### D.    The Fire's Cause

According to Plaintiff's Complaint, "[t]he cause of the fire was never determined." (*Id*. ¶ 28). Fire Marshal Weber ruled the cause as "undetermined," noting two possibilities— accidental means or "it was intentionally started by someone." (*Id*.). Mr. Weber "found no

7

accidental explanation for the fire," and could not eliminate "incendiary events" as the cause. (*Id.*).

### E.    The Unnamed Investor's Offers To Buy The Damaged Property "As Is," And The Village Initiates Legal Actions Against Plaintiff

Plaintiff alleges that on April 22, 2010—not even a week after the fire—Yorkville Police Chief Morelli approached Plaintiff's son, who assists in the family real estate business.  (*Id.* ¶ 61).  Plaintiff claims Police Chief Morelli "was communicating on behalf of Yorkville Mayor DiFilippo and a private third-party investor," who was interested in purchasing the Public Road property in an "as is" condition for $80,000.  (*Id.* ¶ 62).  Plaintiff rejected the offer.  (*Id.* ¶¶ 62–63).

Another offer to purchase Plaintiff's property was extended on June 15, 2010, when Police Chief Morelli told Plaintiff he had an unnamed buyer for the property, who was now willing to purchase the property "as is" for $75,000.  (*Id.* ¶ 64).  Again, Plaintiff rejected the offer.  (*Id.*).  Two days later, Village officials initiated the first of five different legal actions against him for allegedly failing to clean up the remains of the Village-demolished property.  (*Id.* ¶ 66).  Plaintiff claims that these legal actions were designed to force him to sell.  (*Id.*).

### F.    The Lawsuit

On December 9, 2011, Plaintiff filed the instant civil rights action under 42 U.S.C. § 1983, asserting denial of procedural and substantive due process, denial of equal protection, conspiracy, unlawful seizure, and malicious prosecution in connection with the fire and demolition of his property.  (*See* Docs. 1–2).  Plaintiff also asserted supplemental state law claims of wrongful demolition, civil conspiracy, malicious prosecution, abuse of process, and aiding and abetting.  (*See id.*).

### G.     Discovery

Discovery in this lawsuit began, and Plaintiff learned that he wasn't the only one transported to the hospital by the Village squad on April 18, 2010.  Fire Chief Klubert also was taken to the emergency room by ambulance that morning.  Consequently, Plaintiff sought records related to his own care and Fire Chief Klubert's care by the Village squad and emergency service personnel.  (Doc. 43 at 1–2).  Plaintiff claims that those records would reveal the true nature of Fire Chief Klubert's condition the night of the fire and prove that Plaintiff was removed unnecessarily from the scene.  (Doc. 307 at 5).

### 1.     Plaintiff's Document Requests And Defendants' Failure To Respond

Plaintiff served his First Request for Production of Documents on May 25, 2012 (Doc. 43-1), seeking, *inter alia*:

> REQUEST NO. 1:  Any and all documents concerning the series of events and incidents described in the Complaint, or concerning the Defendants' defenses herein, including but not limited to all documents in the possession of Defendant DiFilippo, Defendant Klubert, Defendant Morelli, Defendant Davis, or any other agent or employee of the Village.

> * * *

> REQUEST NO. 18:  Any and all medical records of Defendant Klubert, for any ambulance, doctor, or hospital or other medical-related provider, for services rendered to Defendant Klubert on April 18, 2010, including all emergency room records, testing and test results, x-rays, and billing records.

(*Id.*, PAGEID #: 213–14).   In response, Defendants provided no documents related to the treatment or transport of Plaintiff or Fire Chief Klubert by the Village squad and emergency service personnel the morning of the fire.  (Doc. 43 at 2).

Plaintiff served his Third Request for Production of Documents on October 9, 2012, which sought, *inter alia*:

> REQUEST NO. 1:  At approximately 4:37 a.m. on April 18, 2010, a Village of Yorkville emergency squad transported Mr. DiLuzio from the area of the scene, and took him to the East Ohio Regional Hospital.  It is believed that this vehicle carried the numerical unit designation of unit "8461."
>
> The Plaintiff seeks every document regarding the presence of, and use and activities of, and personnel connected with or operating, any Village of Yorkville emergency squad, including units 8461 and 8471, or any other number, on the date of April 18, 2010, including but not limited to:  time cards, time sheets, or other time records; rosters or other lists of all Yorkville Fire Department emergency medical technicians, ambulance drivers, or other personnel connected with emergency medical service vehicles; all documents showing the locations of such vehicles on that date, the mileage, the medical procedures, tests and activities conducted in connection with Mr. DiLuzio or his transport to the East Regional Ohio Hospital; and any other records of any kind relating to or providing any information regarding the location and activities of Yorkville EMS vehicles or personnel on April 18, 2010, including logs, reports, medical records, audio tapes, test results, or other documents.

(Doc. 43-1, PAGEID #: 216).   On November 2, 2012, defense counsel sent an e-mail to Plaintiff's counsel, requesting a thirty-day extension of time to respond, until December 7, 2012. (*Id.*, PAGEID #: 218).   Plaintiff's counsel agreed to the extension.   (Doc. 43 at 2).   But December 7, 2012 came and went without Defendants producing any documents.  (*Id.*).

On December 13, 2012, Plaintiff's counsel e-mailed a letter to defense counsel, reminding him that responses were past due and asking that counsel "please forward them." (Doc. 43-1, PAGEID #: 220).   Defense counsel responded by e-mail on December 19, 2012— seven months after the initial request, stating "I am still waiting to receive from my clients any documents they have in response to your Third Document Request.  I hope to be able to have the documents by the end of the month."  (*Id.*, PAGEID #: 221).

### 2. Valerie Klubert And William Swoyer Swear The Run Sheets Exist

In the interim, Plaintiff's counsel deposed Valerie Klubert on November 15, 2012.  (Doc.

72-3).  Mrs. Klubert testified that records existed that would show who transported Mr. DiLuzio

to the hospital the night of the fire:

> Q.     You did not ride along with Angelo DiLuzio when he was taken to the hospital?
> A.     No.
> Q.     Do you have records of who did that?
> A.     Yes.
> Q.     Have you seen those records?
> A.     Not recently. They're locked up.
> Q.     And what are those records called or what do they say?
> A.     Run sheets.
> Q.     Run sheets.
>        And does the Village of Yorkville have a run sheet for Mr. DiLuzio's trip to the hospital?
> A.     Yes.
> Q.     And have you provided that to your attorneys?
> A.     No.  I will.
>
> * * *
>
> Q.     Is it a separate piece of paper for each run or separate file for each run, these run sheets?
> A.     It's a sheet for each run.
> Q.     And where are they kept?
> A.     They're locked up.
> Q.     I know that, but where?
> A.     At the Village in the fire department.

(*Id*., PAGEID #: 2152).   Mr. Swoyer similarly testified on November 15, 2012, that he was on

the runs for both Plaintiff and Fire Chief Klubert, and runs sheets were created for each.  (Doc.

77-4, PAGEID #: 4790–91, 4824–25).

### 3. Plaintiff Demands The Run Sheets, And Defendants Promise To Provide Them

In light of the deposition testimony concerning the run sheets, Plaintiff's counsel sent

another letter to defense counsel on December 21, 2012, stating:

11

> During the deposition of Valerie Klubert we discovered for the first time the existence of documents relevant to this case known as "run sheets" and "reports", relating to the medical treatment and transportation of both the Plaintiff and of Defendant Kevin Klubert.
>
> This letter is sent merely as a reminder.  Please forward those run sheets and reports, and every other attached or related document, at your earliest opportunity.  Thanks.

(Doc. 43-1, PAGEID # 222).  Defense counsel responded the same day, stating that he had "followed up with Valerie" and was "waiting to receive the run sheets."  (*Id*., PAGEID #: 224).

On January 21, 2013, Plaintiff's counsel again sent a letter to defense counsel:

> As you know, we have never received a response to our Third Request for Production of Documents, served back on October 9, in spite of an agreed 30 day extension, a letter from you on December 19 indicating that you hoped to produce them in December, a promise during Valerie Klubert's deposition to produce the "run sheets", and your December 21 letter, indicating that "I have followed up with Valerie and am waiting to receive the run sheets."
>
> Could we please get these important documents soon?  Thank you.

(*Id*., PAGEID #: 226).  A week later, on January 28, 2013, defense counsel sent a letter in response, which states, in pertinent part:

> I have had some difficulty during the last month or so in communicating with my clients.  I am going to follow up with them in regard to your Third Request for Production of Documents.

(*Id*., PAGEID #: 228).

### 4. Plaintiff Files A Motion To Compel, And The Court Grants The Motion And Warns Of Sanctions

By March 15, 2013—five days prior to the close of discovery—Plaintiff still had not received the responsive documents.  (*See* Doc. 43 at 3).  Consequently, Plaintiff filed a Motion to Compel, seeking responses to Request Nos. 1 and 18 of the First Request for Production of Documents and Request No. 1 of the Third Request for Production of Documents.  (*Id*. at 2–3).  Plaintiff also sought sanctions.  (*Id*. at 3).

Three days later, the Court issued an Opinion and Order granting Plaintiff's Motion to Compel. (Doc. 44). In doing so, the Court noted that there was no question that the documents existed or that they are relevant. (*Id*. at 3). The Court further stated that it could envision "no response from Defendants that would excuse such a long delay in responding to Plaintiff's request." (*Id*. at 4). Thus, the Court ordered Defendants to produce all records relating to the presence and activities of the Village squad relevant to the dispute within ten days of the Court's Order. (*Id*.). The Court also cautioned that, if Defendants failed to comply with the Order, "they may face sanctions up to and including default judgment." (*Id*.).

### 5. Defendants Move For Reconsideration, And The Run Sheets Disappear

On March 26, 2013, Defendants moved for reconsideration. (Doc. 51). Defendants claimed that they responded to Request No. 1 of the First Request for Production of Documents and produced "a number of documents, including the Yorkville Volunteer Fire Department Report which listed members of the Yorkville Volunteer Fire Department who were present at the fire, including EMS personnel." (*Id*. at 4). Defendants also stated that they produced Fire Chief Klubert's medical records on March 15, 2013, which were responsive to Request No. 18 of the First Request for Production of Documents. (*Id*.). Finally, Defendants made a number of arguments concerning their discovery obligations. (*Id*. at 5–9).

First, Defendants argued that Plaintiff was able to obtain relevant information by deposing Mrs. Klubert and Mr. Swoyer. (*Id*. at 5–6). Next, Defendants stated that "Plaintiff was provided with a copy of the file from Yorkville's former Village Solicitor, Steven Stickles, which included a handwritten list by Mrs. Klubert of all of the members of the Yorkville Volunteer Fire Department, including those assigned to EMS runs, who were present on April

18, 2010." (*Id*. at 6). Defendants added that Plaintiff deposed Mr. Stickles on December 6, 2012. (*Id*.). Finally, Defendants argued:

> A review of Plaintiff's Third Request for Production of Documents indicates that Plaintiff already has some information about his treatment by the EMS personnel from the Village of Yorkville Volunteer Fire Department on the day of the fire. Specifically, in Plaintiff's document request, he references the exact time he was transported to the hospital as well as the unit number for the vehicle in which he was transported. Further, Plaintiff's hospital records should contain the pre-hospital treatment information provided by the Yorkville EMS personnel.

(*Id*.). Thus, Defendants claimed that because Plaintiff deposed two people with knowledge, was provided the names of present EMS members and other members of the Village Fire Department, had hospital records that "should contain" some information about pre-hospital treatment, and had some specific information regarding the transport on the day of the fire, the Motion to Compel should have been denied. (*Id*. at 7).

Last, Defendants expressly addressed the run sheets, stating:

> The undersigned counsel for Defendant Village of Yorkville, upon receiving Plaintiff's Motion to Compel on Friday, March 15, 2013, and the Court's Opinion and Order on Monday, March 18, 2013, immediately contacted the President of the Yorkville Village Council, Blair Closser and the Village's Solicitor, Bernard Battistel. Mr. Closser has informed the undersigned counsel that, after a thorough search of the village records, the run sheets which should exist for anyone transported to a hospital by the Village of Yorkville Volunteer Fire Department EMS, cannot be located for three of four persons transported on April 18, 2010, including the run sheets for Defendant Klubert and Plaintiff. Therefore, Defendant Village of Yorkville is unable to produce the run sheets being sought by Plaintiff.

(*Id*. at 8). This was Defendants' first use of what became familiar refrain in this litigation—that they could not produce documents that were missing or destroyed.

Plaintiff responded. (Doc. 55). First, Plaintiff stated that the one-page Report supposedly responsive to Request No. 1 of the First Request for Production of Documents "contain[ed] no information whatsoever concerning the Yorkville ambulance or EMS personnel,

and no list of Yorkville personnel present" at the events in question. (*Id*. at 2). As to Defendants' argument that hospital records should suffice, Plaintiff noted that the Motion to Compel had "nothing to do with" hospital records; instead, it related to "emergency squad records in possession of the Yorkville Defendants." (*Id*.). Next, Plaintiff asserted that, simply because he "may be able to obtain some information from other sources through testimony[,] is not a justification for a party refusing to produce discoverable documents." (*Id*.). Last, Plaintiff stated, "[w]hat the Court does with th[e] belated, unsworn, unexplained claim of selected documents disappearing from locked storage at the Fire Department, which is under the exclusive custody, control and access of the Defendants, is obviously a matter for the Court to consider and decide." (*Id*. at 4). However, Plaintiff expressed that "[i]t would be a shame if the Defendants could stymie the disclosure of discoverable documents and disobey the Court's discovery order without penalty and further inquiry, simply by saying 'they disappeared.'" (*Id*. at 4–5).

Defendants filed a Reply, attaching affidavits of Mrs. Klubert and Blair Closser, then-Village Council President, repeating their line that "the Village of Yorkville cannot produce documents (EMS run sheets) which it cannot locate." (Doc. 65 at 2–3).

### 6. The Court Denies Defendants' Motion For Reconsideration And Warns Of Sanctions For Spoliation

The Court denied Defendants' Motion for Reconsideration. (Doc. 135). Addressing Request No. 1 of the First Request for Production of Documents, the Court stated:

> [a] review of the report to which the parties refer confirms that it does not contain a list of the members of the Yorkville Volunteer Fire Department who were present at the fire. Report, ECF No. 55-1. Furthermore, it is unclear whether the list in the Village Solicitor's file is the same one that is purported to be included in the Yorkville Volunteer Fire Department report. If it is supposed to be with the report, it is not included in the report Plaintiff attached. If it is a separate

document, the furnishing of one document does not relieve Defendants of the obligation to produce others in response to a document request.

(*Id*. at 5).  As to Request No. 18 of the First Request for Production of Documents, the Court agreed with Plaintiff that producing Fire Chief Klubert's hospital records "does not obviate Defendants' obligation to produce the emergency squad records. . . ."  (*Id*. at 6).  With respect to the run sheets, the Court stated that:

> Defendant's assertion [is] troubling.  Plaintiff has requested these documents from defendants four times since May 25, 2012 . . . These requests include both formal discovery requests for documents that encompass the run sheets, and letters to Defense counsel requesting the run sheets specifically.  Approximately nine months after the first request, and only after Plaintiff filed his motion to compel, Defendants indicate for the first time in their motion for reconsideration that the run sheets cannot be found.  This is concerning, as Defendants do not dispute the existence of the sheets or the deposition testimony indicating that they were "locked up."

(Doc. 135, 8 (citations and footnotes omitted)).  The Court additionally warned that "[s]hould this case go to trial and should Defendants not be able to locate the run sheets prior to it, Plaintiff may move for an adverse inference jury instruction as to the missing evidence on spoliation grounds."  (*Id*. at 9).

### 7.    Plaintiff Seeks Supplemental Discovery, And Defendants Introduce The "Back Room Club"

During the pendency of an interlocutory appeal challenging the Court's decision denying summary judgment (*see* Docs. 164, 165)—which the Sixth Circuit affirmed (*see* Docs. 168, 169)—Plaintiff heard "persistent reports that there was a major scandal regarding stolen money by Village officials."  (Doc. 307 at 7).  Then, on January 28, 2016, Plaintiff filed a Motion for Leave to Conduct Supplemental Discovery Related to Defense Witness Valerie Klubert.  (Doc. 174 at 1).  In the Motion, Plaintiff explained that he had heard that Mrs. Klubert had embezzled approximately $85,000 from the Village of Yorkville and/or the Yorkville Firemen's Fund, but

Village officials "had been covering it up." (*Id*. at 1). Plaintiff alleged that Mrs. Klubert had resigned from her public positions, including a position on Village Council, and promised to repay the money. (*Id*.). Kevin Klubert, too, had resigned as Fire Chief. (*Id*.).

Plaintiff asserted that Mrs. Klubert's "credibility and character for truthfulness are at the center of this case" because, *inter alia*, she testified to seeing the run sheets that later disappeared and gave controverted testimony concerning her husband's whereabouts when the fire started. (*Id*. at 2–3). Plaintiff also claimed that, as a Village Council Member, Mrs. Klubert participated in the drafting of the ordinance under which he was prosecuted unfairly for the alleged maintenance of a structure that constituted a nuisance or hazard to the health and safety of others. (*Id*. at 4–5; *see also* Doc. 159 at 20–21).

In opposition, Defendants asserted that the requested discovery was irrelevant to this case primarily because the money was taken from an organization called the "Back Room Club," not the Fire Department. (Doc. 178 at 3–7). This was a noteworthy argument Defendants used throughout the supplemental discovery in this case—that Mrs. Klubert embezzled money from a separate entity (the Back Room Club), and Defendants thus were powerless to produce discovery. (*Id*. at 4). To their Opposition, Defendants attached current Yorkville Mayor Blair Closser's declaration, in which he swore:

2. Members of the Yorkville Fire Department privately raise money for the fire department in what is known as the Back Room Club.
3. The Village has no involvement in the collection, saving, or spending of the privately raised Back Room Club money.
4. I understand that Valerie Klubert owed money to the Back Room Club.
5. In 2014, the Back Room Club addressed the issue of money owed with Valerie Klubert, independent of the Village of Yorkville, and entered into an agreement for Mrs. Klubert to pay back money to the Back Room Club.
6. The Village of Yorkville had no involvement in the Back Room Club's decision as to how to handle the matter of money owed by Valerie Klubert.

17

> 7.     The Village of Yorkville had no involvement in whether Valerie Klubert
>        should or should not be prosecuted in regard to the money owed to the
>        Back Room Club.

(Doc. 178-1).  Defendants also argued that, as a non-party to this case, Mrs. Klubert's credibility

"is not a fact of consequence in determining the merits of Plaintiff's claims."  (Doc. 178 at 6).

In his Reply, Plaintiff questioned how Mayor Closser would have personal knowledge of

the facts in his declaration if, as he contended, the Back Room Club was a private entity separate

and distinct from the Village.  (Doc. 179 at 4).  Indeed, Plaintiff suggested that Mayor Closser

perjured himself in his sworn statement concerning the relationship between the Village and the

Back Room Club.  (*Id*.).  Plaintiff based this argument on his knowledge of "the relationship

between the Yorkville Fire Department and its shadowy parallel slush fund known as the

Fireman's Fund, or Back Room Club."  (*Id*. at 5).

Plaintiff's knowledge of the Back Room Club came, in part, from another case in this

Court, namely *Aracich et al. v. The Village of Yorkville, et al.*, Case No. 2:07-cv-686.  (*Id*.).  In

that case, Police Chief Morelli, a defendant in this case, described the Back Room Club and the

Fire Department as interchangeable.  (*Id*. at 6).  According to Plaintiff's allegations, the Back

Room Club played a part in this case as well—it was where Fire Chief Klubert drank the night

before the fire and where the allegedly involuntary meeting took place just after the fire, the one

during which Mr. DiLuzio was told "the Mayor wants that building down."  (*Id*. at 8).  Plaintiff

also explained to the Court in his Reply that the Back Room Club was located in the Yorkville

municipal building, within the Fire Department space.  (*Id*. at 8).

## 8.     The Court Grants Supplemental Discovery

In an Opinion and Order issued on March 16, 2016, this Court granted Plaintiff's Motion

for Leave to Conduct Supplemental Discovery and re-opened discovery for twenty-one days,

during which time Plaintiff was permitted "to explore the alleged improprieties by Mrs. Klubert and the connection to Defendants, if any." (Doc. 191 at 4). Defendants filed objections (Doc. 194), which were overruled (Doc. 227). In overruling the objections, the Court noted that Mrs. Klubert's credibility is "highly relevant to her knowledge of the emergency squad reports and the run sheets implicated in this case." (*Id*. at 2).

### 9.    Defendants Fail To Comply

The day following the Court's Order, Plaintiff's counsel sent a letter to defense counsel, requesting to depose Mrs. Klubert and Mayor Closser. (Doc. 241-1 at 1). Plaintiff also sought:

> all documents from Mrs. Klubert, Mr. Closser, the Village and the other Defendants, which relate to the Back Room Club, its exact relationship to the Village/Fire Department, the embezzlement (or whatever you wish to call it) activities, the discovery of those activities, and all actions taken in response by the Village, the Back Room Club, or others.

(*Id*.). On March 18, 2010, Plaintiff sent Defendants a Supplemental Request for Production of Documents. (Doc. 241-2).

On March 21, 2016, Plaintiff noticed the depositions of Mrs. Klubert and Mayor Closser, both to take place on April 1, 2016. (Doc. 241-4). On March 22, 2016, Plaintiff's counsel sent a letter to defense counsel stating that the length of the depositions depended on when he could "receive the requested documents and how complete those disclosures are." (Doc. 241-5). To that end, Plaintiff's counsel asked whether there was any chance that he could receive the discovery on March 29 or 30, 2016. (*Id*.).

Defendants responded to Plaintiff's Supplemental Request for Production of Documents at 12:58 p.m. on March 31, 2016, the day before the depositions were to take place. (Doc. 241-6). Their responses were as follows:

<u>REQUEST NO. 1</u>: In his Affidavit, Yorkville Mayor Closser swore that "members of the Yorkville Volunteer Fire Department privately raise money for the fire department in what is known as the Back Room Club." The Plaintiff requests each and every document in the possession or control of any defendant, or any other agent of the Village, including Valerie Klubert, which confirms or otherwise relates in any way to the Back Room Club or the Fireman's Fund, or to whatever name or entity they use officially, and their funds, their sources of funding, members of the Yorkville safety forces raising money for them, their expenditures for the fire department, and all related documents.

**RESPONSE: Objection. This request exceeds the limited discovery permitted by the Court's Opinion and Order (Doc. 191).**

<u>REQUEST NO. 2</u>: In his affidavit, Yorkville Mayor Closser swore that "Valerie Klubert owed money to the Back Room Club", and "in 2014, the Back Room Club addressed the issue of money owed with Valerie Klubert, independent of the Village of Yorkville, and entered into an agreement for Mrs. Klubert to pay back money to the "Back Room Club." The Plaintiff requests every document in the possession or control of any defendant, or any other agent of the Village, including Valerie Klubert, which confirms or otherwise relates to these statements, including but not limited to:

(a) All documents which reveal or list the identities of the persons who participated in addressing or dealing with the money owed by Mrs. Klubert to the Back Room Clun (in that or any other name).

(b) All print or electronic communications containing any discussion of, or reference to, these matters.

(c) All documents which constitute the agreement, or any part of the agreement referred to by Mayor Closser; and all documents containing or concerning the negotiating of that agreement, the exact terms, and the parties to the agreement.

**RESPONSE: See the attached Agreement for Payment. Objection to any privileged attorney client communications.**

<u>REQUEST NO. 3</u>: All documents listing, describing or accounting for, the finances of the annual Firemen Street Fair, or Firemen's Festival, for the years 2009 through the present, including any documents indicating the profits or net proceeds, the recipient organization or organizations, and the identities of the treasurer(s) or other person receiving or handling those proceeds.

**RESPONSE: Objection. This request exceeds the limited discovery permitted by the Court's Opinion and Order (Doc. 191).**

REQUEST NO. 4:  All documents indicating the officers of the Back Room Club from 2009 through the present.

**RESPONSE:  Objection.  This request exceeds the limited discovery permitted by the Court's Opinion and Order (Doc. 191).**

REQUEST NO. 5:  All documents which discuss the potentially criminal nature of Mrs. Klubert's conduct, whether she would or would not be prosecuted, now or in the future, or any agreement concerning criminal prosecutions.

**RESPONSE:  Objection to any privileged attorney-client communications. Without waiving the objection, none other than privileged communications.**

(*Id.*, PAGEID #: 8763–65).  The only document provided, the Agreement for Payment between Mrs. Klubert and the Back Room Club, was unsigned and undated.  (Doc. 241-7, PAGEID #: 8767–69).  And no privilege log accompanied Defendants' response despite their assertions of privilege.

Dissatisfied with these responses, Plaintiff's counsel attempted to arrange an informal conference with the Court prior to the scheduled depositions.  (Doc. 241 at 3–4).  Although the Court was available, defense counsel did not respond to Plaintiff's request.  (*Id.* at 4).

### 10.  Plaintiff Proceeds With The Depositions Without Responsive Documents

The depositions proceeded without any resolution of Defendants' insufficient responses to Plaintiff's supplemental discovery requests.

#### a.  Valerie Klubert's Second Deposition

During her second deposition, Mrs. Klubert denied any wrongdoing relating to the embezzlement and claimed she no longer serves on Village Council because of a "loss [of] heart."  (Doc. 278-1, PAGEID #: 9389; *see also id.*, PAGEID #: 9407 (swearing under oath that she "[n]ever stole a penny" and has no idea who took the money)).  She testified that she agreed

to pay the money back not because she stole it but because as "the treasurer, the buck stopped with [her]." (*Id.*, PAGEID #: 9408; *see also id.,* PAGEID #: 9437).  Indeed, Mrs. Klubert surmised that the money wasn't stolen at all—perhaps it went missing because of "mismanagement of the books."  (*Id.*, PAGEID #: 9409).  Thus, if Mrs. Klubert is believed, she agreed to pay back some $46,000 merely because she "wanted to move on."  (*Id.*).

Mrs. Klubert's memory on the specifics relating to the embezzlement was spotty.  She didn't remember who first brought the issue of the missing money to her attention, but she recalled repaying the first $20,000 within thirty days of signing an agreement concerning the missing money.  (*Id.*, PAGEID #: 9411, 9438).  She also remembered paying the Village's attorney's fees relating to the missing money but did not recall how much.  (*Id.*, PAGEID #: 9440).  Mrs. Klubert testified that she did not have her own attorney in the negotiations related to the embezzlement (*id.*, PAGEID #: 9441), but the agreement she signed was brought to her by Village Solicitor Battistel (*id.*, PAGEID #: 9401).  She swore that she did not receive a copy of the agreement.  (*Id.*).

Mrs. Klubert also provided insight about the purported distinction between the Fire Department and the Back Room Club.  Although she asserted that they were separate entities, she repeatedly confused the two.  For example:

> Q.     Now, we've been talking about in this case for a long time an organization or a thing called the Firemen's Fund and another name, the Back Room Club or Clubhouse.  I've heard various descriptions or names.
>          What is the formal name of that entity or organization?
> A.     Back room.
> Q.     Just those two words?
>          MR. McNAMARA:  Just answer –
> A.     Just fire department.
>          MR. STOFFERS:  You are to answer as to your knowledge.
> A.     We just called it the Back Room.
> BY MR. McNAMARA:

Q.      And you said the fire department, what did you mean by that?
                MR. STOFFERS:  Objection.
A.      It's a club.  Club Room.  Back Room.
BY MR. McNAMARA:
Q.      It's in the fire department, right?
A.      It's separate.
Q.      But it's located physically in the fire department?
A.      Yes.
Q.      And what makes it separate?
A.      It's private.  I don't know.  It's always been—as far as I know, it's always been
        that way.

                * * *

Q.      Okay.  What does the Firemen's Fund or the Back Room Club do?
                MR. STOFFERS:  Objection in reference to the Firemen's Fund or Back
                Room.
                Go ahead.
MR. McNAMARA:  Well, let's clear that up, before we go on.
BY MR. McNAMARA:
Q.      Sometimes people refer to the Back Room Club as the Firemen's Fund, don't
        they?
A.      I never have.  I don't know.
Q.      If Chief Morelli said—
A.      That's.
Q.      —that that was—have you ever heard the phrase Firemen's Fund before today?
A.      Yes. Yes.
Q.      Did it—
A.      Everyone referred to it different.
                MR. STOFFERS:  There is not a question.  You answered the question.
                Wait until the next question.
Q.      You were going to say everybody referred to it as the Fireman's Fund, right?
A.       No, I wasn't.
Q.      What were you going to say?
A.      Everybody referred to it differently.

(Doc. 278-1, PAGEID #: 9391–92, 9395–97).  When asked about the group's fundraising, Mrs.

Klubert again blurred distinction between the Fire Department and the Back Room Club:

Q.      Once every year, the City holds a five-day festival in the summertime, don't they?
A.      No, the City does not.  The fire department did.  The Back Room.
Q.      Well, the fire department is a department of the City, isn't it?
A.      No, not the Back Room.
Q.      Right, but first you said the fire department?

        A.       Back Room fire department.

(*Id.*, PAGEID #: 9411–12).

Further, Mrs. Klubert gave some specifics concerning how the Back Room Club functions. She testified that Fire Department Members are automatically Back Room Club Members (*id.*, PAGEID #: 9393) although they were required to pay $2 in dues for some years (*id.*, PAGEID #: 9406); the Back Room Club does not pay the Fire Department rent for the use of its space in the municipal building (*id.*, PAGEID #: 9399); and the Back Room Club does not file tax returns. (*Id.*, PAGEID #: 9428). She also testified that the Back Room Club holds regular meetings (*id.*, PAGEID #: 9394) and keeps minutes or records of its activities (*id.*, PAGEID #: 9394). She testified that the books and records for the Back Room Club are kept in a filing cabinet in the Fire Department (*id.*, PAGEID #: 9429), and that the records would include contracts and receipts, among other things (*id.*, PAGEID #: 9430).

### b.      Mayor Closser's First Deposition

Plaintiff also deposed Mayor Closser. During his deposition, Mayor Closser testified he first learned that Mrs. Klubert owed money when he attended a meeting in the Village Council room in the municipal building. (Doc. 278-3, PAGEID #: 9479–80). Shortly after Mayor Closser's deposition began, defense counsel produced Mayor Closser's notes from that meeting. Mayor Closser's initial testimony about those notes was as follows:

    Q.    I might as well ask you about Exhibit 134 while we're talking, because
           those are names I see on here. Let me hand you this one page exhibit.
           Have you ever seen that piece of paper and that writing before?
    A.    That's mine.
    Q.    You prepared that?
    A.    From my notes, yes.
    Q.    Okay.
           When did you type that up?

A. When I knew I was coming for a deposition and I had my notes and I wanted to have it so it was readable, to be honest.

Q. So, this is not an original document from back in 2014, this is something you typed this week or two?

A. It was just my own notes.

Q. Okay.
Where are your personal notes that you drew this from?

A. That I couldn't tell you. I may have it at the house, I may not. And from my college days, the way I write left handed, I can tell you, I have a hard time reading my own writing, so I usually go home and redo things.

Q. So, you would have—some time in the last two or three weeks, you would have gone to those and created this cleaner copy of some of what was in there?

A. For my knowledge, yes.

Q. Okay.
And did you give the notes, the actual notes that you took in the meeting, to anyone, or are they still at your house?

A. They may be at the house. I may have thrown them away after I typed it. I couldn't tell you. I have to go look.

Q. And this would have been a meeting that was held in April of 2014, correct?

A. Yes.

Q. So, in March of 2016, you still have your handwritten notes from that meeting, right?

A. (Witness moves head in an affirmative response).

Q. Yes?

A. Yes.

Q. But you may have thrown them away in the last two weeks?

A. Probably before that, or whenever I was asked to come so that I would have something that I could read, and that's why I did it.

(*Id*., PAGEID #: 9480–82). In sum, Mayor Closser testified that he may have destroyed his original meeting notes, which would have been responsive to Plaintiff's supplemental discovery requests, and created an alternative document based on the original's purported illegibility.

Like Mrs. Klubert, Mayor Closser confused the name of the Back Room Club and had some uncertainty about its organizational structure. For example:

Q. The Board of Control is made up of firefighters?

A. From the Club Room, yes.

Q. Okay.
Are they elected?

    A.    In the Back Room?
    Q.    Yeah.
    A.    Yes.
         I'm sorry, let me—I assume they're elected.  They may be appointed.
         Okay.  I'm not definite on that one.

(*Id.*, PAGEID #: 9498).  Mayor Closser, however, was clear on a different point—when Village

Solicitor Battistel investigated Mrs. Klubert's wrongdoings, he did so on behalf of the Back

Room Club, rather than the Village, despite being the Village Solicitor.  (*Id.*, PAGEID #: 9502).

Mayor Closser testified:

    Q.    Okay.
         When the City attorney Bernie investigated, did he report back to the council?
         MR. STOFFERS:  Objection.
    A.    Bernie was representing the Club Room.  He was hired by the Club Room.  He
         was paid by the Club Room for that.
         BY MR. McNAMARA:
    Q,    How do you know that?
    A.    They told me they were going to hire him—
    Q.    Okay.
    A.    —as their representative.

(*Id.*, PAGEID #: 9501–502).  Finally, Mayor Closser testified that he did not search for any

documents responsive to Plaintiff's supplemental discovery requests.  (*Id.*, PAGEID #: 9503).

**11.    Plaintiff's Second Motion To Compel Discovery And For Sanctions**

Plaintiff filed a second Motion to Compel Discovery and for Sanctions on April 3, 2016,

asserting that Defendants had thwarted his attempts to obtain the supplemental "discovery . . . at

every turn."   (Doc. 241 at 1).  Plaintiff narrowed the issues for the Court's review, directing the

Motion "at two specific failings" in the discovery responses:

First, the defendants have failed and refused to provide documents as requested,
and apparently have destroyed one or more important documents in recent days,
after learning of this supplemental document request.   Second, Mrs. Klubert
refused to answer some questions in her deposition, without legal explanation or
basis, simply because she did not wish to provide the information requested.

26

(*Id*.).  The first basis was derived from Mayor Closser's testimony that he may have destroyed his meeting notes maintained in his records for years and created a new version for use in his deposition.  The second basis was tied directly to the actions of defense counsel during Mrs. Klubert's deposition.

During the deposition, defense counsel stated that he did not represent Mrs. Klubert (Doc. 278-1, PAGEID #: 9415), but repeatedly interjected on her behalf.  Plaintiff offered the following examples, among others, to the Court:

Q.      When did they find out?
        MR. STOFFERS: Objection.
         If you know.
A.      I don't know.
BY MR. McNAMARA:
Q.      Do they know now, the other Village council members who served with you?
A.      I don't know who knows.  I would imagine.  I'm not sure.
        MR. STOFFERS: Don't guess.
A.      I don't know.

* * *
Q.      Okay.
        Did somebody tell you that it was possible for you to be prosecuted—
            MR. STOFFERS:  Objection.
        BY MR. McNAMARA:
Q.      —out of this series of events?
A.      I don't remember.
Q.      Really?
A.      Yeah, really.
            MR. STOFFERS: Objection.
Q.      It never came up?
            MR. STOFFERS: Objection. You asked the question. She answered it.
            Move on, Jim.
Q.      It never came up? Nobody discussed that with you?
            MR. STOFFERS: Objection. Go ahead. Do you have anything more to say
            than what you've already testified to?
A.      No.
             MR.STOFFERS: Next question.

(*Id*., PAGEID #:  9391, 9409–10).  Indeed, counsel went so far as to say that "just because [he

was] not representing [Mrs. Klubert], doesn't mean [he] can't instruct her not to answer. . . ."

(*Id*., PAGEID #:  9415).  And defense counsel did just that:

> MR. McNAMARA: Now, the last question.
> * * *
> (Whereupon, the reporter read the record as requested)
> * * *
> MR. STOFFERS: Objection. That's outside the scope of the court's ordered
> document 191.
> Q.  And what is your answer?
> A.  I'm not answering.
> Q.  You just refuse?
> A.  He told me to.

(*Id*., PAGEID #:  9416).

In opposing the Second Motion to Compel and for Sanctions, Defendants contended that

they complied fully with the supplemental discovery requests, despite producing just two

documents, the unsigned and undated agreement regarding Mrs. Klubert's repayment of funds

and Mayor Closser's newly created notes.  (*See* Doc. 258 at 3–4).  As to those notes, Defendants

stated:

> Mr. Closser testified that he prepared the typed version of his notes simply
> because he was concerned about the legibility of his handwriting and whether he
> and others would even be able to read and understand his notes three years after
> they were written.  Mr. Closser did not consult with anyone regarding his decision
> to type the notes.  Mr. Closser has misplaced the original handwritten notes since
> preparing the typed notes.  Mr. Closser has looked for his original notes after they
> were requested at his deposition.  If Mr. Closser locates the original handwritten
> notes, he will produce them.  Mr. Closser has acted in good faith and Defendants
> should not be sanctioned.

(*Id*. at 4).  And, again, Defendants claimed that they could not "provide documents regarding the

Back Room Club that they do not possess" because "the Back Room Club is a separate and

distinct entity, and not under the control of the Village."  (*Id*. at 5–6).

28

In reply, Plaintiff argued that he sought supplemental discovery related only to Mrs. Klubert's conduct, not related to any distinction between the Village Fire Department and the Back Room Club. (Doc. 271 at 1). Plaintiff asserted it was Defendants' relevancy objection that "turned the debate from one primarily focused on Mrs. Klubert's felony-level misconduct to one primarily focused on the relationship between the Fire Department and the Firemen's Fund," also known as the Back Room Club. (*Id.* at 4). And when Plaintiff's counsel then attempted to explore that relationship, Defendants again "refused to provide discovery on the basis that those issues were not germane." (*Id.* at 4–5).

Plaintiff also disputed Defendants' claim that documents relevant to the embezzlement were not in their possession, custody, and control, stating that Village Council Member, Village Firefighter, and President of the Back Room Club Matt Goolie had access to the relevant documents. (*Id.* at 5–6). Finally, Plaintiff claimed that Mayor Closser acted in conscious disregard of the Court's Order when he failed to produce his original meeting notes, created a new version of them, and the old notes disappeared. (*Id.* at 6–7). In closing, Plaintiff noted:

> This is the second time in this case that the Court has compelled specific discovery, of documents which concededly existed, and which were in the possession of Village officials, which we were later told disappeared. The defendants each time have worked things similarly.
> Once again in this case we are somehow put in a position where evidence is gone, and the Plaintiff and Court are forced to accept on faith the justifications given by the very same people whose credibility is at issue. This is unfair to Mr. DiLuzio.

(*Id.* at 8).

### 12. Assertions Of Privilege And The Discovery Of Mayor Closser's Handwritten, Notably Different, Meeting Notes

On April 14, 2016, Defendants filed a Motion for Leave to File a Supplemental Memorandum in Opposition to Plaintiff's Motion to Compel Discovery and for Sanctions

*Instanter*.  (Doc. 275).  The Motion for Leave consisted of a mere three sentences, which indicated that leave was sought "to update the Court on the discovery dispute at issue."  (*Id*. at 1).  The entirety of the Supplemental Memorandum stated:

> Attached hereto are the Second Amended Responses of Defendants Village of Yorkville, DeFilippo and Klubert to Plaintiff's Supplemental Request for Production of Documents.  The Court will see that Defendants have now attached the 4/13/2014 handwritten notes of Blair Closser which have been at issue in this case.  Mr. Closser located the notes on April 13, 2016.  Additionally, Defendants have further explained their objections based upon privilege.

(Doc. 275-1, PAGEID #: 9328).  Immediately following the Supplemental Memorandum were the updated responses to Plaintiff's Supplemental Request for Production of Documents, attaching four exhibits:  (1) Defendants' Second Amended Responses to the Request for Documents (Doc. 275-2, PAGEID #: 9330–35); (2) an unsigned copy of an Agreement for Payment (*id*., PAGEID #: 9336–38); (3) a document provided by Mayor Closser at his deposition, which was purported to be "a summary" of his contemporaneous handwritten notes from the 2014 meeting (*id*., PAGEID #: 9339); and (4) a copy of Mayor Closser's handwritten notes, which Mayor Closser claimed could not be located, but were now found (*id*., PAGEID #: 9340).

> The amended responses were as follows:

> REQUEST NO. 1:  In his Affidavit, Yorkville Mayor Closser swore that "members of the Yorkville Volunteer Fire Department privately raise money for the fire department in what is known as the Back Room Club."  The Plaintiff requests each and every document in the possession or control of any defendant, or any other agent of the Village, including Valerie Klubert, which confirms or otherwise relates in any way to the Back Room Club or the Fireman's Fund, or to whatever name or entity they use officially, and their funds, their sources of funding, members of the Yorkville safety forces raising money for them, their expenditures for the fire department, and all related documents.

> **RESPONSE:  Objection.  This request exceeds the limited discovery permitted by the Court's Opinion and Order (Doc. 191).  Without waiving**

the objection, Defendants Village of Yorkville, Mayor DeFilippo (deceased) and Kevin Klubert do not have any of the requested documents.

REQUEST NO. 2:  In his affidavit, Yorkville Mayor Closser swore that "Valerie Klubert owed money to the Back Room Club", and "in 2014, the Back Room Club addressed the issue of money owed with Valerie Klubert, independent of the Village of Yorkville, and entered into an agreement for Mrs. Klubert to pay back money to the "Back Room Club."  The Plaintiff requests every document in the possession or control of any defendant, or any other agent of the Village, including Valerie Klubert, which confirms or otherwise relates to these statements, including but not limited to:

(d) All documents which reveal or list the identities of the persons who participated in addressing or dealing with the money owed by Mrs. Klubert to the Back Room Club (in that or any other name).

(e) All print or electronic communications containing any discussion of, or reference to, these matters.

(f) All documents which constitute the agreement, or any part of the agreement referred to by Mayor Closser; and all documents containing or concerning the negotiating of that agreement, the exact terms, and the parties to the agreement.

**RESPONSE:    See the attached Agreement for Payment, 4/13/2014 handwritten and typed personal notes of Blair Closser.**

**Objection to any privileged documents.  The only privileged documents would be notes taken during an executive session of the Village Council, which was attended by the Village's Solicitor.  The Village has made inquiry of the council members to see if any of the members have notes.  If any such notes exist, a privilege log will be submitted referencing the notes.**

REQUEST NO. 3: All documents listing, describing or accounting for, the finances of the annual Firemen Street Fair, or Firemen's Festival, for the years 2009 through the present, including any documents indicating the profits or net proceeds, the recipient organization or organizations, and the identities of the treasurer(s) or other person receiving or handling those proceeds.

**RESPONSE:  Objection.  This request exceeds the limited discovery permitted by the Court's Opinion and Order (Doc. 191).  Without waiving the objection, Defendants Village of Yorkville, Mayor DeFilippo (deceased) and Kevin Klubert do not have any of the requested documents.**

**Per Mr. Closser's notes, an audit was to be prepared by Bernie Battistel when he was acting as counsel for the Back Room Club. These Defendants do not have the audit and this document may be subject to an attorney-client privilege concerning Mr. Battistel and the Back Room Club.**

REQUEST NO. 4:  All documents indicating the officers of the Back Room Club from 2009 through the present.

**RESPONSE:  Objection.  This request exceeds the limited discovery permitted by the Court's Opinion and Order (Doc. 191).  Without waiving the objection, Defendants Village of Yorkville, Mayor DeFilippo (deceased) and Kevin Klubert do not have any of the requested documents.**

REQUEST NO. 5:  All documents which discuss the potentially criminal nature of Mrs. Klubert's conduct, whether she would or would not be prosecuted, now or in the future, or any agreement concerning criminal prosecutions.

**RESPONSE:  Objection to any privileged attorney-client communications. Without waiving the objection, Defendants do not have any responsive documents other than privileged notes.  See the following.**

**The only privileged documents would be notes taken during an executive session of the Village Council, which was attended by the Village's Solicitor. The Village has made inquiry of the council members to see if any of the members have notes.  If any such notes exist, a privilege log will be submitted referencing the notes.**

(*Id.*, PAGEID #: 9330–34).

In addition, the following are images of the attached typewritten notes offered by Mayor Closser at his deposition and, below those, his handwritten notes (*Id.*, PAGEID #: 9339–40):

4 / 13 / 2014

RE:    Club Room Funds / Valerie Klubert

B. Closser          D. Copeland
B. Battistel        D. Brown
P. Grady            J. Dombo

Board of Control's Recommendations:
- Suspend Valerie Klubert as Club Room Treasurer
- Close Club Room Checking Account (Monday)
- Freeze Account Access
- Freeze Safe Deposit Box

Bernie to investigate / review all financial information from Club Room finances.

Club Room hired Bernie to represent them.

Per Bernie Battistel, Solicitor - Village is not involved since no money from Club Room goes through Village or Fire Levy.

Club Room funds come from fundraisers and/or donations.

---

FIRE DEPT.                                    4-13-14

B. CLOSSER            D. COPELAND
B. BATTISTEL          D. BROWN
P. GRADY              J. DOMBO


BOARD OF CONTROL
→ RECOMMENDATION : SUSPEND AS DEPT. TREASURER
                   Close Checking Account (MONDAY)
                   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
                   FREEZE ACCOUNT ACCESS
                   FREEZE SAFE DEPOSIT BOX

→ BERNIE TO INVESTIGATE / REVIEW ALL FINANCIAL
  INFO. FROM CLUB ROOM FINANCES

33

The two versions are different in material respects.  Nowhere in the accompanying memorandum did Defendants attempt to explain, or even acknowledge, these profound differences.  (*See* Doc. 275).

Not surprisingly, Plaintiff did not oppose Defendants' Motion for Leave, stating that the "documents submitted . . . are an important addition to the evidence in the record."  (Doc. 288 at 1).  Plaintiff responded separately to the merits of Defendants' supplemental filings.  (Doc. 289).  There, Plaintiff argued that "[o]ne thing is established beyond any further dispute . . . . [a]fter Mayor Closser received word that this Court had ordered the Village Defendants to provide supplemental discovery, he intentionally created and submitted evidence which he knew was false."  (*Id*. at 2).

### a.  Mayor Closser's Testimony Concerning The Notes

As an initial matter, it is now undisputed that the handwritten notes are legible.  Thus, Mayor Closser was untruthful when he testified he typed them to make them "readable, to be honest."  (Doc. 278-3, PAGEID #: 9480).  Indeed, without prompting, Mayor Closser elaborated: "[F]rom my college days, the way I write left handed, I can tell you, I have a hard time reading my own writing, so I usually go home and redo things."  Thus, he falsely testified that he created typewritten notes because of his poor handwriting.  (*Id*., PAGEID #: 9481).

### b.  A Substantive Comparison

A comparison of the handwritten and the typewritten notes demonstrates that the typewritten notes were crafted to support Mayor Closser's prior declaration (Doc. 178-1, PAGEID #: 8017) and Defendants' theory that Mrs. Klubert had embezzled the money from the Back Room Club and not from Defendants.  For example, Mayor Closser's handwritten notes begin with the heading "<u>FIRE DEPT.</u>," which reflects that the meeting concerned the Fire

Department, not the Back Room Club.  Mayor Closser changed that in the typewritten version, replacing "FIRE DEPT." with "RE: Club Room Funds / Valerie Klubert."  Mayor Closser also changed the "Board of Control's Recommendations."  The handwritten notes show that the Board of Control recommended that Mrs. Klubert be suspended as "Dept. Treasurer," the "checking account" was to be closed on Monday, and account and safe deposit access would be frozen.  Included in that list was a recommendation that was crossed out; however, the Court can decipher the words "from Dept. ground" within that text.  In stark contrast, the typewritten notes include the Board of Control's recommendation that Mrs. Klubert be suspended "as *Club Room* Treasurer" and the "*Club Room* Checking Account" was to be closed (emphasis added).  The crossed-out recommendation is excluded.  And, as Plaintiff argues, "it is unclear whether the line of writing that is covered over in the original notes was scratched out back in 2014, or just recently before the document was disclosed."  (Doc. 289 at 6).

Finally, in what Plaintiff has referred to as Mayor Closser's "most grandiose alteration of the truth," he inserted three lines into the typewritten notes that appear nowhere in the handwritten notes.  (*Id.*).  Those lines state:

Club Room hired Bernie to represent them.

Per Bernie Battistel, Solicitor—Village is not involved since no money from Club Room goes through Village or Fire Levy.

Club Room funds come from fundraisers and/or donations.

(*Id.*).  Plaintiff claims that each of these lines was offered to support Defendants' theory that they need not comply with this Court's Discovery Order.

**13.    Plaintiff Requests Default Judgment And Continues To Seek Discovery Concerning Mrs. Klubert's Embezzlement**

"In light of the extreme nature of the defendants' failure to comply with a Court Order," Plaintiff requested judgment in his favor against Defendants.  (Doc. 289 at 8).  Relying on Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure, Plaintiff argued that Defendants' "calculated subterfuge in response to a discovery order is precisely the type of disobedience" that warranted including default as a sanction in the Civil Rules.  (*Id*.).  Plaintiff also added that "[a]fter Requests for Documents, two supplemental responses, and the depositions of Mrs. Klubert and Mayor Closser, the Plaintiff still has almost none of the facts we are seeking."  (*Id*. at 9).

**14.    The Court Holds A Hearing**

On April 26, 2016, this Court held a hearing on Plaintiff's Motion to Compel Discovery and for Sanctions (Doc. 241) and Defendants' Motion to file a Supplemental Memorandum in Opposition to the Motion to Compel Discovery and for Sanctions (Doc. 275; Doc. 291).  The Court heard argument on the Motions from both sides and asked questions of counsel on the record.  (Doc. 315).  Then the Court met with counsel in chambers.  At that time, the Court implored the parties to cooperate in the production of the supplemental discovery and set a status conference for one week later, on May 3, 2016.

**15.    Defense Counsel Promises Cooperation**

Also on April 26, 2016, defense counsel sent a letter to Plaintiff's counsel promising cooperation with discovery.  (*See* Doc. 307-1, PAGEID #: 100009).  Specifically, defense counsel indicated that he had contacted "Bernie Battistel, the attorney who handled the Valerie Klubert matter for the Back Room Club," and requested:

36

- The signed Agreement with Mrs. Klubert and the Back Room Club;

- Documentation from the Back Room Club's bank account that shows the payments made by Mrs. Klubert per the Agreement;

- Any meeting minutes for the Back Room Club where the missing funds were discussed;

- The audit that resulted in the amount of money being determined to be owed by Mrs. Klubert to the Back Room Club;

- Any notes from the Back Room Club regarding Mrs. Klubert and the missing funds.

(*Id*.).  Defense counsel also stated that he had requested "the Village" to provide him "any minutes from Village Council meetings, either regular sessions or executive sessions, where the situation between Mrs. Klubert and the Back Room Club were discussed." (*Id*.).

As Plaintiff has argued, "[w]hile this was clearly a proper step, the Supplemental Request for Documents had been served almost 6 weeks earlier.  The effort to gather these documents on April 26 begged the question of why this had not been done in a timely manner." (Doc. 307 at 17).

### 16.    The Court Holds Another Status Conference

The Court held another status conference on the outstanding discovery on May 3, 2016. During that conference, Plaintiff's counsel was optimistic that defense counsel would provide the supplemental discovery.  Hence, the Court agreed to defer ruling on sanctions until after that discovery was completed.  The same day, the Court issued an Order continuing discovery until July 1, 2016, again for the limited purpose of allowing Plaintiff to explore the alleged improprieties by Mrs. Klubert and the connection to Defendants, if any. (Doc. 294).  The Court also scheduled a status conference for July 8, 2016. (*Id*.).

### 17.    Another Unfruitful Effort To Obtain Documents

Based on Defendants' insistence that it had no access to the documents, Plaintiff—who simply wanted his discovery—subpoenaed documents from Village Council Member and Village Firefighter Matt Goolie, who was reportedly the current Back Room Club President. (Doc. 307 at 18).  Neither Mr. Goolie nor any other representative of the Back Room Club delivered the response to the subpoena.  Instead, current Village Solicitor Edward Littlejohn hand delivered the response.  (*Id*.).  And, as Plaintiff explained, the cover letters and all follow-up letters, were copied to Defendants' counsel only, not "to any club or to any attorney for any club."  (*Id*.).

The totality of the documents provided by Solicitor Littlejohn were:  "(1) a document entitled 'Yorkville Back Room Club, Inc., By-Laws, Adopted 2015', (2) an incomplete set of 'club meeting minutes' for some but not all months from 2012-present, (3) bank statements from only the years 2015 and 2016 for a checking at The Citizens Bank, and (4) monthly statements from only the years 2015 and 2016 for an investment account at L.P.L. Financial."  (*Id*. at 18–19 (footnote omitted)).  Thereafter, counsel exchanged several letters in the context of which Plaintiff's counsel repeatedly explained that the production was insufficient.  (*Id*. at 19 (noting letters dated May 20, May 24, May 25, May 31, and June 6, 2016)).  For instance, Plaintiff's counsel explained that he had not been provided even a single investigation document, including any correspondence, audit, or signed agreement relating to the missing money.  (Doc. 307-3, PAGEID #: 10015).

Defendants' answers prompted more questions.  For example, in a May 25, 2016 letter, Solicitor Littlejohn stated that Mr. Goolie did not possess the requested banking statements and,

"due to the fact that the account is now closed it may be more beneficial to subpoena U.S. Bank

for their records." (*Id.*, PAGEID #: 10018).  In response, Plaintiff's counsel wrote:

> We don't see the connection between the closing of the old bank accounts, and all of the monthly statements, deposit records, and other records from those accounts before they were closed.  In short we are talking about the financial records from 2007-2014 which were among the source documents audited, investigated, and which revealed Mrs. Klubert's embezzlement.  We are talking about records showing dates and amounts of any repayments by Mrs. Klubert.
>
> Mr. Goolie is apparently telling us that all of these documents have disappeared from the files of the Back Room, but he has not really said so.  Is it the case that not a single file or piece of paper remains in the Back Room records regarding the entire Valerie Klubert affair?  And not a single bank statement or other financial document exists in the Back Room possession for any account prior to February of 2015?  Do you have any explanation as to what happened to the documents?

(*Id.*, PAGEID #: 10020).   Although Solicitor Littlejohn had facilitated the response to the

subpoena on behalf of the Backroom Club, he now stated that, as the current Village Solicitor, he

"[could not] address the manner in which the Back Room does or does not keep their records;

nor can I address who did or currently does have access to the records that you are requesting.

Mr. Goolie has provided all of the information that he has access to."  (*Id.*, PAGEID #: 10022).

### 18.    Additional Depositions

Like in April, in mid-June 2016, Plaintiff was forced to proceed with depositions with

few responsive documents.

#### a.    Mayor Closser's Second Deposition And Subsequent "Errata Sheet" Changing His Testimony

At Mayor Closser's second deposition, his memory regarding the embezzlement, like

Mrs. Klubert's, was spotty.  For instance, Mayor Closser could not recall who asked him to

attend the April 13, 2014 meeting, didn't know when or how the thefts were discovered, and

didn't know the period of time during which the thefts occurred.  (Doc. 299-1, PAGEID #: 9582–83).  He did, however, have a very clear memory as to one thing:

> A.    The only question I did ask was with Mr. Battistel, whether the village was involved in it as far as the money and all. . . .
> Q,    You asked Mr. Battistel that?
> A.    (Witness nodded affirmatively.)
> Q.    You have to answer out loud.
> A.    Yes.
> Q.    And what was Mr. Battistel's answer during this April meeting?
> A.    Since the money didn't go through the village funds, the village was not involved in that.

(*Id*., PAGEID #: 9583).  Thus, Mayor Closser had perfect recall concerning the fact that the Village had no involvement with Mrs. Klubert's embezzlement.  (*See id*.).

Mayor Closser also testified about his meeting notes, claiming he found the handwritten notes in "[his] file at the city building," specifically in the Mayor's office.  (*Id*.).  He made clear that the handwritten notes produced were a copy and that he didn't have the original.  (*Id*., PAGEID #: 9583–84).  Mayor Closser explained that he had the original notes at his house when he constructed the typewritten notes, and when he was done creating the typewritten notes he "discarded [them]."  (*Id*., PAGEID #: 9584; *see also id*., PAGEID #: 9586 (noting that he typed the notes in his family room and then discarded the original)).  This was contrary to his prior to testimony, in which he said he "may have thrown them away," but he'd "have to go look."  (Doc. 278-3, PAGEID #: 9481).  Thus, Plaintiff learned on June 14, 2016, that there were *three* versions of Mayor Closser's notes—the original, which were created contemporaneously at the 2014 meeting and then destroyed in 2016; what the Court has called the handwritten version, which is a copy of the original notes and was produced only after Plaintiff filed the Second Motion to Compel; and the typewritten version, which was produced only after Plaintiff's counsel pressed for them at Mayor Closser's first deposition.

40

When asked why no version of the notes was produced in response to Plaintiff's request for supplemental discovery, Mayor Closser stated, "[t]hey were my personal notes, and I really didn't think they were part of the so-called documents." (Doc. 299-1, PAGEID #: 9585). Mayor Closser further testified that he didn't give the typewritten notes to defense counsel in advance of the deposition, and he brought them to his deposition despite his view that they were not responsive to discovery. (*Id*.). Plaintiff's counsel asked:

> Q.   Why did you bring [the typewritten notes] if you thought [the document] wasn't covered?
> A.   Those were my personal notes; and when I was informed that I was going to be giving a deposition, I wanted to make sure I had information in front of me that I could answer any question that you had honestly and that I could recall that meeting from two years ago.

(*Id*.).

Plaintiff's counsel questioned Mayor Closser in detail about his search for the handwritten notes and, more specifically, when he discovered them. Mayor Closser testified that he found the copy of his handwritten notes in the municipal building on either April 1 or April 2, 2016:

> Q.   How long after your last deposition did you eventually find those notes?
> A.   I went back that day or the day after searching for them.
> Q.   And found them at the municipal building?
> A.   Yes.
> Q.   So that would have been either April 1st or April 2nd.  Right?
> A.   Yes.  And I found it by luck because it was stapled to some other papers, and I was going through every file and every drawer.

(Doc. 299-1, PAGEID #: 9586). Mayor Closser then swore that he sent the handwritten notes to defense counsel "as soon as [he] found them." (*Id*.). When asked if he would know why, then, it took defense counsel until April 14, 2016—nearly two weeks later—to produce the handwritten

notes, Mayor Closser simply answered "no."  (*Id.*).  But this wouldn't be the last that Mayor Closser had to say on this topic.

On July 5, 2016, Mayor Closser completed the following errata sheet, changing his testimony as to when he found the notes:

129

1          AFFIDAVIT/ERRATA SHEET

2     STATE OF OHIO:
                        SS:
3     COUNTY OF FRANKLIN:

4        DILUZIO vs. VILLAGE OF YORKVILLE, et al.

5              I, Blair Closser, do hereby certify
      that I have read the foregoing transcript of my
6     deposition given on June 14, 2016, and wish to make
      the following additions, corrections, amendments,
7     or deletions:

8     PAGE NO.   LINE NO.   CHANGE AND REASON FOR CHANGE:

9     77      2-11     I wish to Amend my Response to the

10    question on lines 2-5. I did not locate A copy of my

11    notes on April 1 or 2. I located the copy of my notes

12    on Wednesday, April 13 And e-mailed the copy to

13    Bob Stoffers on Thursday, April 14, 2016. After

14    the deposition on June 14, I looked At An e-mail

15    that I sent to Bob on April 14, 2016, with a

16    copy of my notes Attached.

17

18    In all other respects, the transcript is true and
      correct.
19

20                          Blair Closser
                            Blair Closser
21
      Subscribed and sworn to before me this 5 day
22    of July , 2016.

23
                                    PEGGY A. GRADY
24                                  Notary Public, State of Ohio
                                    My Commission Expires Oct 05, 2016
      NOTARY PUBLIC, STATE OF OHIO
25    My Commission Expires: 10-05-2016

      Higgins & Associates ... (614) 985.DEPO(3376)
           www.HigginsCourtReporting.com



EXHIBIT

A

43

(Doc. 309-1, PAGEID #: 10048).  This approach was not only permitted by defense counsel but used as a basis to argue against sanctions.  (*See* Doc. 309, PAGEID #:10030 ("While Mayor Closser incorrectly testified to the timeline of the production of his handwritten notes, he filed an errata sheet correcting the timeline and clearly establishing that the Village Defendants' counsel did not have the handwritten copy at the time the Memorandum in Opposition was filed.")).

Turning back to Mayor Closser's deposition, he also testified about his decision to type the notes so that they would be legible.  Contrary to his previous testimony, Mayor Closser now admitted that the notes could be read without difficulty:

> Q.     So there wasn't really a handwriting problem with this page of notes, was there?
> A.     No.

(Doc. 299-1, PAGEID #: 9588).  Changing his story, Mayor Closser now insisted that he typed the notes so that they would "look professional" and "presentable," an explanation which made little sense based on his prior testimony that he created them for his own use.  (*Id*.).

Mayor Closser also testified about the differences between the typewritten notes and the handwritten notes.  Mayor Closser acknowledged that he changed Fire Department to Club Room but asserted that he did so to aid in his own understanding of what transpired:

> Q.     So why did you change the heading from "Fire Department" to "Club Room"?
> A.     Because for me, I know what I—what this meeting was about when I put "Fire Department," that it involved the club room.  I put this here, because when I came to the deposition, if I said "fire department," the first thing that would be thought of was we're talking about truck room [sic] and the front of the building.  So I typed it so that it would be understood by me and anyone else that we were talking about the club room, because "fire department"—in our village, "fire department" is the umbrella for everything.

(*Id.*, PAGEID #: 9589).  And Mayor Closser told a similar story about adding lines into the typewritten notes that appear nowhere in the handwritten notes, stating that he did so because he "was trying to recall everything" and so he could have the information "in a presentable form." (*Id.*, PAGEID #: 9592).

Mayor Closser also testified that Village Council held an executive session on May 6, 2014, during which the thefts were discussed because "[t]he club room president, Darby Copeland, asked if they could come and give the council an update as to what was—what they found and what was going to occur."  (*Id.*, PAGEID #: 9590–91).  Mayor Closser stated that the meeting was held in executive session because "[t]hey asked for it, because they wanted to inform council so that council, if they heard that money was stolen from the fire department out in public, that it was clear that it was not the fire department funds; it was the club room money." (*Id.*, PAGEID #: 9591).

### b.     Bernie Battistel's Deposition

Plaintiff deposed former Village Solicitor Bernie Battistel on June 16, 2016.  He testified that he met with defense counsel to prepare for the deposition and, during that meeting, defense counsel provided him with "the [typewritten] notes that Mr. Closser provided to [Plaintiff's counsel]," and "minutes from a Back Room Club meeting."  (Doc. 300-1, PAGEID #: 9635). Mr. Battistel testified that he had not seen Mayor Closser's handwritten notes.  (*Id.*).

Mr. Battistel testified that he had in his possession an "Agreement to Pay" between two parties, but he could not produce it because there was "a clause in it stating that both parties agree not to disclose the specifics . . . [to] any outside parties."  (*Id.*, PAGEID #: 9637–38).  He explained that he had asked Mr. Goolie if he would have permission to disclose it pursuant to the

subpoena, but it had been approximately a month and he hadn't heard back.  (*Id*., PAGEID #: 9638–39).

Mr. Battistel testified that he was asked to participate, in his role as Village Solicitor, in the April 13, 2014 meeting about Valerie Klubert, which was held on a Sunday in Village Council chambers.  (*Id*., PAGEID #: 9648–49).  He stated that it was at that meeting that he first learned of the Back Room Club:

> Q.    Okay.
>        Who told you that they were separate or different in some way?
> A.    I believe, at this meeting is when we were discussing it.  I had no knowledge of what the Back Room Club was, so I had asked.  They told me.
>        My interpretation of it was that they were—it came to a booster club.

(*Id*., PAGEID #: 9652, 9655).  And it was during this meeting that Mr. Battistel agreed to review the investigation findings related to Mrs. Klubert.  (*Id*., PAGEID #: 9658).

Mr. Battistel reviewed documents related to the investigation in May, which were primarily from U.S. Bank.  (*Id*., PAGEID #: 9660).  Darby Copeland had given Mr. Battistel the relevant records, which he kept for approximately one month.  (*Id*., PAGEID #: 9661–62).  He testified that the audit he reviewed covered 2007 to 2014.  (*Id*., PAGEID #: 9666).

Mr. Battistel explained that, when he finished his review of the documents, he hand delivered them to Mr. Copeland:

> Q.    And where did you take them and give them to him?
> A.    I gave them to him—I had something in Belmont County that day, and he works around that area.  It was at an exit.  We met on the side of the road somewhere and I gave him that information.  Yeah. I gave it to him there.
> Q.    You returned all of the financial records of the Back Room Club that he had previously given to you to look at?
> A.    Correct.

(*Id.*, PAGEID #: 9662).  He testified that it was a copious amount of paperwork, and he did not keep copies for his files.  (*Id.*, PAGEID #: 9664).

Defense counsel then asked Mr. Battistel a number of questions about the typewritten notes, which Plaintiff has referred to as an attempt "to rehabilitate the fabricated document which Mayor Closser had attempted to pass off as his meeting notes."  (Doc. 307 at 23).  That testimony includes the following:

> Q.    [BY MR. STOFFERS] The second paragraph is, "Per Bernie Battistel, Solicitor, Village is not involved since no money from club room goes to Village or fire levy."
> Was that discussed?
> A.    Yeah.  Like I said, I didn't know what the Back Room Club was at the time of this meeting, so I—yeah.  Once they told me exactly what their function was, then, yes, that was discussed.

(Doc. 300-1, PAGEID #: 9689).  Upon questioning from Plaintiff's counsel, however, Mr. Battistel provided some clarification:

> Q.    "Per Bernie Battistel, Solicitor, Village is not involved.
> Doesn't that sound to you like it seems like you're telling them that?  "Per Bernie Battistel, Solicitor."
> A.    I would say, that's the way it reads, yes.
> Q.    But that's not the way it really happened.  They were explaining to you about the Back Room Club; correct?
> MR. STOFFERS:  Objection.
> THE WITNESS:  I would say, they explained to me what the Back Room Club was, and then I gave my opinion as to whether or not the Village was involved.

(*Id.*, PAGEID #: 9691).

### c.    Matt Goolie's Deposition

Village Council Member and Village Firefighter Matt Goolie testified that he had not been asked to search for any documents in this case until he received the subpoena in May 2016.  (Doc. 302-1, PAGEID #: 9906).  Mr. Goolie explained that, when he received the subpoena, he

went to a Back Room Club meeting and asked if there were responsive documents.  (*Id.*, PAGEID #: 9867–68).  He was told by "[t]he membership"—he couldn't recall who—"that the only thing that the Back Room Club had was from the middle of, I do believe, 2014 to present." (*Id.*, PAGEID #: 9868).  In other words, all of the documents relevant to the Valerie Klubert matter were missing.

 And the documents he was able to produce in response to the subpoena, the ones Solicitor Littlejohn hand delivered to Plaintiff's counsel, had been in a filing cabinet in the Fire Department's officers' room, not the Back Room.  (*Id.*, PAGEID #: 9871).  Mr. Goolie explained that, although the Back Room Club has its own room in the municipal building, its records are kept in the main Fire Department office.  (*Id.*).  In addition, Mr. Goolie could not explain why the Village Solicitor was involved in his gathering of responsive documents on behalf of the Back Room Club; he was just instructed "to take them to [the Village Solicitor]  first."  (*Id.*, PAGEID #: 9912).

 Mr. Goolie also had information relevant to the distinction between the Village and the Back Room Club.  In response to the subpoena, he produced a March 31, 2016 statement from Citizens Bank addressed to "The Village of Yorkville dba Yorkville Fire Department Backroom."  (Doc. 307-4, PAGEID #: 10023).  When asked about the structure of the Back Room Club at his deposition, he testified that, to his knowledge, the Back Room Club did not have any articles of incorporation and did not file taxes.  (Doc. 302-1, PAGEID #: 9875).

### d.    Darby Copeland's Deposition

 Plaintiff also deposed Darby Copeland who, in addition to holding several other positions in the Village government, was "president of the Back Room for two years," in 2014 and 2015. (Doc. 301-1, PAGEID #: 9723, 9727).  Like other witnesses, Mr. Copeland confirmed that the

Back Room Club was not registered as a legal entity (*see*, *e.g.*, *id.*, PAGEID #: 9724), and that he had not been asked to look for any documents prior to receiving the subpoena in June (*id.*, PAGEID #: 9720–21). He also testified about records relating to Mrs. Klubert's embezzlement, stating:

A.   Initially, we—when we finally received those, I had those in my possession for a short period of time.
Q.   And then, what did you do with them?
A.   I turned them over to our Solicitor, Bernie Battistel.
Q.   Do you recall when it was that you gave those to Mr. Battistel?
A.   I do not.
Q.   It would have been sometime in the first half of 2014; wouldn't it?
A.   That's correct.
Q.   Did he ever give them back to you?
A.   He did not.
Q.   Never?
A.   Never.

(*Id.*, PAGEID #: 9730). Thus, he had no recollection of the roadside exchange described by Mr. Battistel, and Mr. Copeland produced no documents in response to the subpoena. (*See id.*, PAGEID #: 9730, 9742–43, 9753–54).

Mr. Copeland—even though he was Backroom Club President at the time of the embezzlement—offered few details about the matter. For example, when asked how Mrs. Klubert "actually took the money," he stated "I would say that there was probably a variety of ways." (*Id.*, PAGEID #: 9771). When asked to elaborate, Mr. Copeland responded, "I can't prove what happened. I can just tell you, there weren't—there weren't funds where they should have been." (*Id.*, PAGEID #: 9772).

### 19.   The Court Holds Yet Another Status Conference, The Parties File Supplemental Briefs, And The Court Holds Another Hearing

The Court held another status conference on July 8, 2016, and ordered supplemental briefing on the Motion to Compel Discovery and for Sanctions. (Doc. 304). Plaintiff filed his

49

supplemental brief on July 18, 2016 (Doc. 307), and Defendants filed their supplemental brief on

August 8, 2016 (Doc. 309).  On September 27, 2016, the Court heard oral argument.  (Doc. 324).

## II.    DISCUSSION

Although Plaintiff captioned his Motion as one to compel discovery and for sanctions

(Doc. 241), he now has made clear that he no longer is pursuing discovery based on his belief

that any additional discovery effort would be fruitless.  (Doc. 324, PAGEID #: 10237).  Instead,

Plaintiff seeks sanctions; specifically, a default judgment for discovery violations and the cost

associated with pursuing the discovery he never received.  (*Id.*).

The Sixth Circuit has held that "Rule 37 of the Federal Rules of Civil Procedure governs

sanctions for one's failure to make or cooperate in discovery.  The purpose of imposing sanctions

is to assure both future compliance with the discovery rules and to punish past discovery failures,

as well as to compensate a party for expenses incurred due to another party's failure to properly

allow discovery."  *Jackson v. Nissan Motor Corp.*, No. 88-6132, 1989 WL 128639, at *3 (6th

Cir. Oct. 30, 1989) (quotations and citation omitted).  The Court may consider both punishment

and deterrence in fashioning an appropriate sanction under Rule 37.  *Laukus v. Rio Brands, Inc.*,

292 F.R.D. 485, 500 (N.D. Ohio 2013) (citing *Bratka v. Anheuser–Busch Co.*, 164 F.R.D. 448,

459 (S.D. Ohio 1995)).

### A.    Default Judgment

The most severe sanction for discovery violations is a default judgment. *Grange Mut.

Cas. Co. v. Mack*, 270 F. App'x 372, 376 (6th Cir. 2008).  In determining whether default

judgment is an appropriate sanction, the Court considers four factors:  (1) whether the

disobedient party acted in willful bad faith; (2) whether the opposing party suffered prejudice;

(3) whether the court warned the disobedient party that failure to cooperate could result in a

default judgment; and (4) whether less drastic sanctions were imposed or considered.  *Id.*; *see also Vogerl v. Elliott*, No. 09-713-MRB-JGW, 2010 WL 4683950, at *2 (S.D. Ohio Sept. 9, 2010) (listing the four factors).  Here, all four factors weigh heavily in favor of the entry of default judgment.

### 1.    Bad Faith

The Court first considers whether the failure to cooperate in discovery was the result of willfulness, bad faith, or fault.  *United States v. Allen*, No. 2:12-cv-1034, 2014 WL 3530850, at *4 (S.D. Ohio July 15, 2014).  If a party refuses to comply with discovery repeatedly, such conduct is indicative of "willfulness, bad faith, or fault."  *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d, 1067, 1079 (6th Cir. 1990); *see also Allstate Ins. Co. v. Awan & Assoc. P.C.*, No. 11-11988, 2013 WL 1340142, at *5 (E.D. Mich. Apr. 3, 2013) ("As the Sixth Circuit has explained, repeated noncompliance with court-sanctioned discovery requests suggests willfulness, bad faith, or fault."); *Sarco Creek Ranch v. Greeson*, 167 F. Supp. 3d 835, 845 (S.D. Tex. 2016) ("Bad faith and willful abuse have been found when a party or its counsel maintains patently unreasonable litigation positions or engages in contumacious behavior that deliberately subverts a court's administration of a case.").

In this case, Defendants' repeated and concerted efforts to avoid discovery included, but were not limited to, fabrication, untruthful and evasive testimony, "missing" and destroyed documents, unjustified delay, and baseless objections.

### a.    Fabrication

Defendants chose Mayor Closser as their representative—the person who would offer an explanation as to why certain discovery could not be produced.  First, they filed Mayor Closser's affidavit concerning the run sheets; he swore they could not be located.  (Doc. 65-2, PAGEID #:

51

798–99). Next, they filed Mayor Closser's declaration to support their theory that they could not produce documents concerning Valerie Klubert's embezzlement. (Doc. 178-1, PAGEID #: 8017). Naturally, Plaintiff's counsel sought to depose him, but Plaintiff's counsel was forced to go into the deposition cold because Defendants had produced no relevant documents.

That changed at the deposition, where defense counsel reluctantly produced Mayor Closser's typewritten notes after he was pressed to do so. (*See* Doc. 278-3, PAGEID #: 9483–84 (defense counsel objecting on the grounds that they weren't subpoenaed)). In fact, if Plaintiff's counsel hadn't pushed to know what was in Mayor Closser's folder at the deposition, the typewritten notes might not have been produced at all. (*See id.*, PAGEID #: 9486 (defense counsel noting that Mayor Closser "didn't bring [the typewritten notes] in response to any subpoena, just happened to have [them] in a folder")). After Plaintiff's counsel finally received the typewritten notes, Mayor Closser testified at length about them—never acknowledging or hinting that they were different from the original, handwritten notes. (*See, e.g.*, *id.*, PAGEID #: 9480–83). But those marked differences were readily apparent when Defendants finally produced the handwritten notes after repeated Court intervention.

As discussed *supra* (at p. 34–35), Mayor Closser changed the heading "FIRE DEPT.," to "RE: Club Room Funds / Valerie Klubert," as well as the Board of Control's recommendation. (*Compare* Doc. 289-1, PAGEID #: 9554 *with* Doc. 289-2, PAGEID #: 9555). While the Board of Control's recommendation in the handwritten notes was that Mrs. Klubert be suspended as "Dept. Treasurer," the "checking account" be closed on Monday, and account and safe deposit access be frozen; in the fabricated version, the Board of Control's recommendation is that Mrs. Klubert be suspended "as Club Room Treasurer" and that the "Club Room Checking Account" be closed. (*Id.*).

52

Included in the Board of Control's recommendation in the handwritten notes is a crossed out line that does not appear in the typewritten notes, within which the Court can decipher the words "from Dept. ground." (Doc. 289-1, PAGEID #: 9554). It would be logical for this line to represent the Board of Control's recommendation that Mrs. Klubert be banned from the "Dept. ground," because, in her deposition, Mrs. Klubert testified to a ban from "Club property." (Doc. 178-1, PAGEID #: 9446). This would be consistent with all of the other changes, which substituted the Fire Department with the Back Room Club to support Defendants' theory for non-production. To that end, Mayor Closser also inserted the following lines into the typewritten notes that appear nowhere in the handwritten notes:

> Club Room hired Bernie to represent them.

> Per Bernie Battistel, Solicitor—Village is not involved since no money from Club Room goes through Village or Fire Levy.

> Club Room funds come from fundraisers and/or donations.

(*Id.*).

More than once, defense counsel has asked this Court rhetorically why Mayor Closser would lie. (*See, e.g.*, Doc. 324, PAGEID #: 10300–301 ("Did you ever indicate to yourself what is he trying to hide?")). Based on a totality of the circumstances, the Court finds that Mayor Closser fabricated the typewritten notes to avoid discovery. The handwritten notes undermine Defendants' legal theory for withholding the embezzlement-related documents. Thus, Mayor Closser fabricated the notes to make them consistent with his declaration and Defendants' position that only the Back Room Club had control over the requested documents. Mayor Closser was strident in his explanation for their fabrication, falsely explaining that his handwriting is so illegible that he has been rewriting things since college. The clearly legible

notes reveal the lie, and Defendants have offered no plausible explanation for the changes. The Court finds this indicative of bad faith. *See, e.g.*, *Vargas v. Peltz*, 901 F. Supp. 1572, 1582 (S.D. Fla. 1995) (finding bad faith based on, *inter alia*, fabrication of evidence warranted dismissal of plaintiff's claims); *JFB Hart Coatings, Inc. v. AM Gen. LLC*, 764 F. Supp. 2d 974, 986–87 (N.D. Ill. 2011) (noting that document fabrication constitutes fraud on the court).

### b. Untruthful And Evasive Testimony

#### i. Blair Closser

There can be no question that Mayor Closser provided untruthful testimony concerning the notes, having told inconsistent stories about them under oath. First, he swore that he created them so they were "readable." (Doc. 278-3, PAGEID #: 9480–82). But even he could not deny their legibility after they were finally produced. He then claimed he had created the notes to "look professional" and "presentable," despite the fact that he claimed to have created the version for his own use. (Doc. 299-1, PAGEID #: 9588). Throughout, Mayor Closser maintained that the typewritten notes assisted him in remembering what took place at the meeting two years prior. But wouldn't his perfectly legible handwritten notes serve that purpose?

Mayor Closser also provided untruthful testimony about his search for the handwritten notes. During his second deposition, Mayor Closser testified in detail concerning his search for the handwritten notes, testifying that he found the copy in the municipal building on either April 1 or April 2, 2016, and provided them to defense counsel "as soon as [he] found them." (*Id.*, PAGEID #: 9586). This testimony was problematic for Defendants, who did not produce the handwritten notes to the Court until April 14, 2016, nearly two weeks later, despite the Court's continued inquiries. (*See, e.g.*, Doc. 257, PAGEID #: 8857). So Mayor Closser changed his

story in an errata sheet, typically used to correct stenographic errors.  *See Jackson v. Teamsters Local Union 922*, 310 F.R.D. 179, 181–82 (D.C. Cir. 2015) (citing *A.C. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 702–03 (6th Cir. 2013)).  But this change was significant—he now swore that he located a copy of the notes on April 13, 2016, and e-mailed a copy to defense counsel on April 14, 2016.  In sum, when Mayor Closser's testimony didn't support Defendants' theory for non-production, he changed it.

During his second deposition, Mayor Closser gained sudden clarity on another topic—the destruction of his original notes.  During his first deposition, he was murky when asked about the location of his original notes, swearing that he "may have thrown them away," but he'd "have to go look."  (Doc. 278-3, PAGEID #: 9481).  But by the time of his second deposition, Mayor Closser's clarity had returned.  He now recalled that he had the original notes at his house when he made the new ones and, when he was done creating them, he discarded the original.  However misguided (the destruction of evidence is not a legitimate excuse for a failure to produce discovery), his testimony again was designed to bolster Defendants' position on non-production.

### ii.        Darby Copeland

Mr. Copeland, a friend of the Kluberts (Doc. 301-1, PAGEID #: 9717), and former Back Room Club President, Village EMS Chief, Village Fire Department Member, and Village Police Officer under Defendant Police Chief Morelli, also adopted Defendants' approach to discovery, providing evasive testimony about Mrs. Klubert's embezzlement.  Mr. Copeland was responsible for "commission[ing] the audit committee to review the books" and was on the frontlines of the investigation that revealed the embezzlement.  (*Id.*, PAGEID #: 9754).  Mr. Copeland requested the relevant bank records, reviewed them personally, and flagged any activity he thought "looked peculiar."  (*Id.*, PAGEID #: 9756–58).  He also was monitoring the checking account daily when

Mrs. Klubert made the $20,000 deposit to cover a portion of the missing funds.  (*Id.*, PAGEID #: 9760–61).  Despite his oversight of the audit, he would only speculate during his deposition that there could have been "a variety of ways" that Mrs. Klubert stole the money and simply stated that "there weren't funds where they should have been."  (*Id.*, PAGEID #: 9771–72).  He also swore that he had the embezzlement records only for a short time before he gave them to Mr. Battistel, who never returned them.  (*Id.*, PAGEID #: 9730).

Mr. Battistel's testimony, in stark contrast, was quite clear.  He swore that he had a voluminous amount of audit documents for about a month, which he returned to Mr. Copeland in a roadside meeting.  (Doc. 300-1, PAGEID #: 9661–62).  More specifically, Mr. Battistel explained that the meeting with Mr. Copeland took place at an exit where he returned the copious amount of paperwork, none of which was maintained for his files.  (*Id.*, PAGEID #: 9662, 9664).  Simply stated, it would be remarkable if such a roadside exchange took place and Mr. Copeland had no recollection of it.

Bad faith may be found where, as here, a party is "forced either to attempt independent corroboration of each submission, at substantial expense of time and money, or to accept the possibility that every . . . statement . . . is incomplete or inaccurate."  *Freddie v. Marten Transp., Ltd.*, 428 F. App'x 801, 804 (10th Cir. 2011) (quotations and citations omitted) (finding that Plaintiff's inconsistent statements "amounted to an unacceptable level of interference with the judicial process"); *see also Vargas*, 901 F. Supp. at 1582 (finding bad faith where pattern of discovery misconduct included untruthful testimony that obstructed justice, frustrated the opposing party's ability to conduct discovery); *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 76–80 (5th Cir. 2011) (affirming dismissal for perjury during deposition testimony).  Such is the

case here—each deposition led to more questions than answers, and Defendants purposefully left Plaintiff chasing his tail.

<p style="text-align:center"><strong>c.        Missing And Destroyed Documents</strong></p>

Defendants also repeatedly claimed that relevant documents, which had been confirmed to exist, were now missing.  For example, both Mrs. Klubert and Mr. Swoyer testified that run sheets were created for Plaintiff and Fire Chief Klubert the morning of the fire, but it wasn't until ten months after Plaintiff's initial request for them that Defendants first claimed that they were "missing" and could not be produced.

And like the run sheets, every document in the voluminous set of documents related to Mrs. Klubert's embezzlement mysteriously disappeared.  Assuming Mr. Battistel's testimony is true, those documents disappeared at some point after the roadside exchange took place.  When that occurred in relation to this case remains unknown.

Finally, there is the destruction of the original notes that Mayor Closser took during the meeting about Mrs. Klubert's embezzlement.  Ultimately, he would produce only a copy of those notes because, after having preserved them from April 2014 until March 2016, he discarded them after fabricating the new version.  This, he contends, was based on his belief that they didn't qualify as "documents" responsive to Plaintiff's requests.

Defendants' actions in connection with the missing and destroyed documents demonstrate bad faith.  *See Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 564 (7th Cir. 2007) (finding dismissal was not an abuse of discretion where the district court had sufficient evidence of bad faith relating to concealment of documents).

### d.    Baseless Objections And Unjustified Delay

Defendants took another approach in resisting discovery—making baseless objections. Defendants repeatedly objected to Plaintiff's supplemental discovery requests as "outside the scope" of the Court's Order, despite this Court's broad language allowing Plaintiff "to explore the alleged improprieties by Mrs. Klubert and the connection to Defendants, if any" (Doc. 191 at 4), and admonishment on multiple occasions that Defendants were taking far too narrow a view of its Order.  Defendants also threw in privilege objections, without providing a log or otherwise explaining documents withheld on this basis.  *See* Fed. R. Civ. P. 26(b)(5)(A) ("When a party withholds information otherwise discoverable by claiming that the information is privileged . . . , the party must . . . describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged. . . , will enable other parties to assess the claim.").  As it turned out, Defendants ultimately revealed in their amended responses very few, if any, such documents existed, making the privilege objections an unnecessary, prophylactic measure.

Further, the deposition transcripts are replete with indefensible objections made by defense counsel to support Defendants' theory behind non-production.  For example, when Mrs. Klubert confused the Fire Department and the Back Room Club, defense counsel interrupted that she should "[j]ust answer . . . as to [her] knowledge" and objected to the "reference to the Firemen's Fund or Back Room."  (Doc. 278-1, PAGEID #:  9391–92, 9395–97).  He further coached her, "[t]here is not a question.  You answered the question. Wait until the next question" (*id.*, PAGEID #: 9396) and provided advice, "Don't guess," despite the fact that he did not represent her (*id.*, PAGEID #:  9391, 9409–10, 9415).  He even instructed her not answer.  (*Id.*, PAGEID #:  9415–16).  Defense counsel went so far as acting as the judge at times rather than

objecting, "You asked the question.  She answered it. Move on, Jim."  (*Id.*, PAGEID #: 9410).  Again, the message was clear—Defendants were going to prevent Plaintiff from getting the information he sought by whatever means.

Defendants also delayed to the point that the Court concludes they were attempting to run out the discovery clock in an attempt to avoid producing discovery at all.  Not only were documents missing and destroyed, but Defendants made Plaintiff wait months upon months before they told him so.  Some ten months after Plaintiff requested the run sheets, Defendants, for the first time, informed him and the Court that the run sheets couldn't be found.  Prior to that time, the Court informed Defendants that it could envision "no response . . . that would excuse such a long delay in responding to Plaintiff's request."  (Doc. 44 at 4).  That the documents were "missing" was not an acceptable excuse.  Best case scenario, Defendants simply did not look for the documents, despite their representations and prolonged delay.  Worst case scenario, Defendants caused Plaintiff to endure the unreasonable wait knowing all along that they had destroyed the documents.  Either way, Defendants committed a sanctionable discovery violation.

A similar scenario arose concerning Mayor Closser's handwritten notes.  Mayor Closser turned over the fabricated notes the day of his first deposition, on April 1, 2016.  The Court held a final pretrial conference April 5, 2016, during which the Court specifically questioned defense counsel, more than once, whether Mr. Closser had looked for his handwritten notes.  (Doc. 257, PAGEID #: 8857).  He couldn't find them, defense counsel told the Court.  The Court asked about the search for the handwritten notes again during an April 7, 2016 status conference.  Again, defense counsel represented that they had not been located.  It wasn't until April 14, 2016, that Defendants submitted the handwritten notes as an attachment to the Motion for Leave to File a Supplemental Memorandum in Opposition to Plaintiff's Motion.  If Mayor Closser's

testimony—and not the later-submitted errata sheet—is believed, then he discovered the copy of his handwritten notes on April 1 or April 2, 2016, and provided them to defense counsel immediately. This leaves an inexplicable delay of nearly two weeks, during which the highly sought-after handwritten notes were located but not produced to Plaintiff or the Court. *See In re Nat'l Century Fin. Enter., Inc. Fin. Inv. Litig.*, 2009 WL 2169174, at *1 (S.D. Ohio July 16, 2009) ("Although no one factor is dispositive, dismissal is proper if the record demonstrates delay or contumacious conduct.").

Given Defendants' fabrication, untruthful and evasive testimony, the "missing" and destroyed documents, unjustified delay, and baseless objections, the Court finds their failure to cooperate in discovery was the result of willfulness, bad faith, or fault. In any given case, a witness might have a faulty memory, a deadline might be missed, or a document might accidentally be destroyed. But here, again and again, Defendants frustrated Plaintiff's efforts to get at the truth, and the Court concludes that Defendants—some of whom are public officials—consciously thwarted the discovery process.

### 2. Prejudice

The second factor is satisfied if the failure to provide discovery deprives the opposing party of information critical to their case and they are forced to expend significant time and resources addressing the discovery abuses. *Grange*, 270 F. App'x at 376; *see also Vogerl*, No. 09-713-MRB-JGW, 2010 WL 4683950, at *3 ("Plaintiff has been severely prejudiced by her inability to conduct discovery in this case, and has wasted significant time and money first attempting to gain defendant's voluntary cooperation, and subsequently seeking defendant's forced cooperation through this court. Plaintiff cannot be expected to do more.").

First, Plaintiff has been deprived of information critical to his case.  The run sheets might have shown that Plaintiff was unnecessarily removed from the scene and that Fire Chief Klubert's judgment was impaired the night of the fire due to his intoxication.   And Mrs. Klubert's embezzlement is relevant because she is a central character who has a connection to nearly every pertinent event and witness in this case.  Plaintiff claims she is the relative of Mr. Swoyer, the man who allegedly requested him to leave the basement door to the middle building unlocked the weekend of the fire.  She offered critical alibi testimony for her husband—claiming he was at home with her when the fire started—in stark contrast to Plaintiff's testimony that Fire Chief Klubert was on his patio, intoxicated and in plain clothes, one minute after the 9-1-1 call.  And as a Village EMT and Village Firefighter, Mrs. Klubert is alleged to have devised and executed a scheme together with her husband, Mr. Swoyer, Mr. Swoyer's son, and others to remove Plaintiff from the scene of the fire for unnecessary medical treatment, allowing the fire to burn without Plaintiff's interference.   And the Court cannot overlook that Mrs. Klubert was serving her second four-year term on Village Council when Village officials approached Plaintiff on behalf of a wealthy investor who wished to acquire the property, arranged for and executed the demolition of his property almost immediately after the fire, and instituted various legal actions against him.

Given Mrs. Klubert's knowledge and relation to nearly all of the events relevant to this case and Plaintiff's theory that the fire was set intentionally as a pretext for the demolition, Mrs. Klubert is a key witness.  That is why the Court allowed the supplemental discovery in the first place—because the information sought was highly relevant to her credibility and the interplay between her and Defendants.  Because of Defendants' obstruction, Plaintiff knows little, if anything, about Mrs. Klubert's embezzlement or her possible motivation to lie in this case.

Second, as detailed in the background section, Plaintiff and the Court have spent countless hours prodding Defendants to comply with their discovery obligations. All told, Defendants have distorted the discovery process in this case, taking what is supposed to be a transparent process under the Federal Rules of Civil Procedure and turning it into an all-out war over information. They had many weapons in their arsenal—fabrication, untruthful and evasive testimony, "missing" or destroyed documents, baseless objections, and unjustified delay— employing them all over the course of the many years this litigation has dragged on. Defendants' unwavering war against discovery deprived Plaintiff of information essential to a fair resolution at trial and forced him and this Court to expend an extraordinary amount of time and resources. Plaintiff has demonstrated prejudice, and the second factor used to determine whether default judgment is an appropriate sanction is satisfied.

### 3.    Warning

The third factor is satisfied if the court warned the disobedient party that failure to cooperate could result in a default judgment. *Grange*, 270 F. App'x at 376; *see also Vogerl*, 2010 WL 4683950, at *2. For example, the disobedient party may be warned by the filing of a motion, *see Allstate Ins. Co.*, 2013 WL 1340142, at *5 ("after plaintiffs filed this motion, defendants were well-aware that a default judgment could be entered against them"), or at a hearing, *Grange*, 270 F. App'x at 377.

In this case, the Court repeatedly warned Defendants that failure to cooperate in discovery could lead to default judgment. The first warning occurred nearly four years ago, on March 18, 2013, when the Court granted Plaintiff's Motion to Compel. Specifically, the Court warned Defendants if they failed to comply with the Court's Order compelling discovery, "they may face sanctions up to and including default judgment." (Doc. 44 at 4). More recently,

62

Defendants were put on notice that they faced the possibility of a default judgment as a discovery violation through Plaintiff's briefing.  (*See, e.g.*, Doc. 289 at 8 (arguing that Defendants' "calculated subterfuge in response to a discovery order is precisely the type of disobedience" that warrants default as a sanction in the Civil Rules).  The Court warned Defendants again at a July 8, 2016 status conference.

During oral argument on September 27, 2016, the Court noted that default judgment was discussed as a potential sanction during the July 8, 2016 conference.  (Doc. 324, PAGEID #: 10236).  The Court stated:

> The Court held its most recent conference on July 8th of this year.  At the conference, we discussed the status of discovery and in particular plaintiff's request for default judgment.  I expressly noted the requirements for default judgment and asked the parties to brief the issue.  Both parties did so. . . . Based on that conference and the parties' briefing, the Court's current understanding is that plaintiff is pursuing default judgment and no longer seeks discovery because he believes the effort would be fruitless.
> Mr. McNamara, is that correct?
> MR. McNAMARA:  Yes, Your Honor.
> THE COURT:  And it is defendants' position that no additional discovery exists.  You have produced everything you are going to produce.
> Is that correct, Mr. Stoffers?
> MR. STOFFERS:  That's correct, Your Honor.
>
> * * *
>
> THE COURT:  And I would also like to confirm with defense counsel—and I am confident this is true, but I want to confirm on the record—that your clients are aware that plaintiff has moved for default judgment.
> Mr. Stoffers, have you confirmed that with your client, let your client know?
> MR. STOFFERS:  Yes, Your Honor.

(*Id*., PAGEID #: 10237).  Based upon the foregoing, there can be no question that the third factor used to determine whether default judgment is an appropriate sanction is satisfied.

### 4.      Consideration Of Less Drastic Sanctions

Finally, the Court considers whether sanctions less drastic than default judgment would be appropriate in light of the conduct.  *Grange*, 270 F. App'x at 376; *Vogerl*, 2010 WL 4683950, at *2.  Although the Court must consider less drastic sanctions, "there is no legal requirement for a district judge to *issue* lesser sanctions before entering a default judgment." *Grange*, 270 F. App'x at 377 (emphasis added); *see also Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 368 (6th Cir. 1997) ("[T]he district court's consideration or imposition of lesser sanctions is a *factor* in our review, not a *sine qua non* for affirmance.").

Here, the Court has considered sanctions less drastic than default judgment and has discussed those possible sanctions at numerous status conferences and during oral argument.  At oral argument, the Court explained:

> I am required to impose the least severe sanction that will still be effective.  That is the sanction that is proportionate to the seriousness of any infraction under the facts of a particular case.  Said another way, any sanction imposed must be commensurate with the degree of prejudice.  Accordingly, several of my questions will be focused on that particular requirement.

(Doc. 324, PAGEID #: 10238).  Although Plaintiff requested default judgment, the Court asked his counsel, "If default judgment is not awarded here, what would be an appropriate adverse inference here to remedy the alleged discovery violations?"  (*Id.*, PAGEID #: 10289).  Indulging the Court, Plaintiff's counsel provided an unclear answer—perhaps the Court could deem facts admitted (*id.*), prohibit Defendants from arguing good faith (*id.*), create an instruction related to the run sheets (*id.*, PAGEID #: 10290), tell the jury that Plaintiff tried to get documents but they disappeared in Defendants' possession (*id.*), allow the jury to infer that the documents would have "included information detrimental to the defense's position as to the credibility of both Mrs. Klubert and the Village officials as a whole" (*id.*)?

64

Plaintiff's counsel struggled to provide an answer because an adverse inference would be impossible to construct here. Credibility means everything in a case where it is alleged, *inter alia*, that Mrs. Klubert told Plaintiff her relative wished to be a tenant at his property (a claim she denies; *see, e.g.*, (Doc. 72-3 at 490 (swearing she is "certain" that she is not related to Mr. Swoyer)); Plaintiff kept the door unlocked at the request of that tenant; Fire Chief Klubert burned Plaintiff's building down as pretext for the Village officials demolishing a different, more valuable, building virtually unharmed by the fire; Village officials made repeated offers to buy Plaintiff's demolished property on behalf of an unnamed investor; and Village officials instituted five different legal actions against Plaintiff related to cleaning up the remains of Village's demotion of his property. And when Defendants have fabricated evidence, provided untruthful and evasive testimony, offered repeated claims of "missing" or destroyed documents as an excuse for non-production, lodged baseless objections, and caused unjustified delay, what lesser sanction could possibly allow Plaintiff to prosecute his case fairly?

At base, Defendants' repeated discovery violations have left Plaintiff in a position where neither he, nor the jury, could possibly put together the many missing pieces of his case. Simply knowing that Defendants refused to provide information or that information has been lost would not be nearly enough. Here, a municipality and its officials have failed to comply in good faith with the discovery process and Orders of this Court, and both punishment and deterrence weigh heavily in favor of default judgment. Although this Court has thoughtfully considered less drastic sanctions, including the parties' arguments on the subject, the Court finds the recommendation of default judgment is appropriate for the pervasive and blatant discovery violations in this case. *See, e.g.*, *Bratka*, 164 F.R.D. at 462 (awarding default judgment as a sanction for obstruction, complication, and delay of discovery in spite of Court orders).

Based on its determination that Defendants acted in willful bad faith; Plaintiff suffered prejudice; it warned Defendants that failure to cooperate could result in a default judgment; and it considered less drastic sanctions, the Court finds that default judgment is an appropriate sanction for Defendants' discovery violations.

### B.    Monetary Sanctions

Plaintiff has also moved for attorney's fees and costs.  Rule 37(b) of the Federal Rules of Civil Procedure provides for sanctions when a party fails to comply with a discovery order. *Laukus*, 292 F.R.D. at 500.  Regardless of what sanction is imposed, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2); *see also Zang v. Zang*, No. 1:11-cv-884, 2014 WL 5426212, at *4 (S.D. Ohio Oct. 22, 2014) (noting that Magistrate Judge has the authority to impose a monetary sanction of attorney's fees and costs). Because this Court has determined that Defendants acted in bad faith, there is no question that they should be required to pay the reasonable expenses, including attorney's fees, associated with the Motion for Sanctions.  *See Jackson*, 1989 WL 128639, at *3 (noting that sanctions are "to compensate a party for expenses incurred due to another party's failure to properly allow discovery") (citation omitted).  The only outstanding issue is whether defense counsel should share responsibility with his clients.

Under Rule 26(g) of the Federal Rules of Civil Procedure, and as the Court explained in *Brown v. Tellermate Holdings, Ltd*., No. 2:11-cv-1122, 2014 WL 2987051, at *17 (S.D. Ohio July 1, 2014):

> [E]very time an attorney signs a disclosure, discovery response, or objection, the attorney is certifying that to the best of the attorney's knowledge, information, and belief formed after a reasonable inquiry, the statements the attorney is making are consistent with the rules, warranted by existing law or by a nonfrivolous argument for extending or changing the law, not interposed for any improper purpose, and not unduly burdensome or unreasonable.

*Id.* (quotations and alterations omitted). Sanctions for violating that Rule are authorized in Rule 26(g)(3). Those sanctions can be imposed if the attorney fails to fulfill the "duty to make a reasonable investigation to assure that their clients have provided all available responsive information and documents." *Id.* (*quoting Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1333 (S.D. Fla. 2007)). The Court determines what is reasonable based on a totality of the circumstances. *Id.* (citation omitted). In addition to the authority to impose sanctions against counsel under Rule 37 and Rule 26(g), the Court has "the inherent power to impose sanctions to prevent the abuse of the judicial process." *Laukus,* 292 F.R.D. at 502 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991) (noting that the inherent power of a court can be invoked even if procedural rules exist that sanction the same conduct)).

This decision has already described some of defense counsel's behavior in this case but has appropriately focused on his clients' behavior in recommending default judgment. *See Grange*, 270 F. App'x at 376 (noting the court's hesitation to find default judgment solely based on conduct of counsel). However, Defendants couldn't have engaged in the repeated and concerted discovery violations without defense counsel's assistance. The following sections highlight the ways in which defense counsel facilitated his clients' discovery abuses. As explained below, defense counsel failed to conduct a reasonable investigation into his clients' representations concerning discovery, failed to design and execute a plan to search for and produce responsive documents, failed to work with his clients to preserve sources of

67

discoverable information, and failed to cooperate and be transparent during the discovery process.  Consequently, monetary sanctions against counsel, as well as his clients, are warranted.

### 1. Investigation

In responding to discovery requests, counsel is obligated to examine critically the information that a client provides about the existence and availability of the requested documents. *See, e.g.*, *Tellermate*, 2014 WL 2987051, at *1.  More specifically, counsel has a duty "to cooperate in the discovery process; to be transparent about what information exists, how it is maintained, and whether and how it can be retrieved; and above all exercise sufficient diligence . . . to ensure that all representations made to opposing parties and to the Court are truthful and based upon a reasonable investigation of facts." *Id*.  In this case, defense counsel accepted his clients' representations concerning the existence and availability of requested documents as true, without any investigation.  The two most glaring examples involve the run sheets and documents related to Mrs. Klubert's embezzlement.

### a. The Run Sheets

A timeline relevant to Plaintiff's requests for the run sheets, Defendants' responses, and the run sheets' disappearance is demonstrative:

- May 25, 2012:  Plaintiff serves his First Request for Production of Documents seeking, *inter alia*, documents related to his care and transport and the care and transport of Fire Chief Klubert (Doc. 43-1, PAGEID #: 212);

- October 9, 2012:  Plaintiff serves his Third Request for Production of Documents, again requesting the documents related to his care and transport and the care and transport of Fire Chief Klubert (*Id*., PAGEID #: 215);

- November 2, 2012:  Defense counsel requests, and Plaintiff's counsel grants, a thirty-day extension to respond, until December 7, 2012 (*Id*., PAGEID #: 218);

- November 15, 2012:  Mrs. Klubert testifies that the run sheets exist and are locked up in the Fire Department (Doc. 72-3, PAGEID #: 2151); Mr. Swoyer also testifies that run sheets exist for both Plaintiff and Fire Chief Klubert. (Doc. 77-4, PAGEID #: 4790–91, 4824–25);

- December 7, 2012: The extension deadline passes without production of the documents;

- December 13, 2012: Plaintiff's counsel sends a letter to defense counsel, reminding him that responses are past due and asking that counsel "please forward them" (Doc. 43-1, PAGEID #: 220);

- December 19, 2012: defense counsel responds, indicating that he is still waiting to receive responsive documents, which he hopes to have by the end of the month (*Id.*, PAGEID #: 221);

- December 21, 2012:  Plaintiff's counsel sends a second letter to defense counsel requesting that run sheets be produced (*Id.*, PAGEID # 222).  Defense counsel responds the same day, stating that he has "followed up with Valerie" and is "waiting to receive the run sheets"  (*Id.*, PAGEID #: 224);

- January 21, 2013:  Plaintiff's counsel sends a third letter to defense counsel once again requesting the run sheets (*Id.*, PAGEID #: 226);

- January 28, 2013:  defense counsel sends a letter indicating that he is having difficulty communicating with his clients, but he will follow up (*Id.*, PAGEID #: 228);

- March 15, 2013:  Plaintiff files the Motion to Compel and for Sanctions, five days prior to the close of discovery (Doc. 43); and

- March 18, 2013, the Court issues an Opinion and Order granting Plaintiff's Motion to Compel (Doc. 44).

Thus, for the better part of a year—from May 2012 until March 2013—defense counsel did nothing more than request more time to respond, say he was waiting to receive documents, claim he was having trouble communicating with his client, and make empty promises to produce the documents.

In causing what this Court has deemed an inexcusable delay (*see id*. at 4), defense counsel represented to Plaintiff and this Court that the documents existed—it was simply a matter of time before the run sheets would be produced.  Indeed, the Court noted that "there was no question that the documents existed or that they are relevant."  (*Id*. at 3).  For those reasons, the Court granted the Motion to Compel and warned that noncompliance could result in "sanctions up to and including default judgment."  (*Id*. at 4).

Facing sanctions, defense counsel finally pressed his clients for information concerning the existence and availability of the run sheets.  Eight days after the Court intervened, on March 26, 2013, defense counsel filed a Motion for Reconsideration.  (Doc. 51).  In the Motion, defense counsel placed the burden of production squarely on the shoulders of Mrs. Klubert, who reported to him that they couldn't be located.  (*Id*. at 7).  He asked her to search again, he said, but he's not sure if she ever did.  (*Id*.).  Despite this, defense counsel lauded his swift and "immediate" effort to contact Yorkville Village Council President Closser and Village Solicitor Battistel "upon receiving Plaintiff's Motion to Compel on Friday, March 15, 2013, and the Court's Opinion and Order on Monday, March 18, 2013."  (*Id*. at 8).  There was no explanation why that "immediate" action was not taken when Defendants received the first request (ten months before), when Defendants received the next request (five months before), when Mrs. Klubert and Mr. Swoyer testified that run sheets existed and were locked up in the Fire Department (four months before), or when Plaintiff's counsel sent a third letter specifically requesting the documents (two months before).

Instead, defense counsel explained unapologetically that, now that the search had been conducted, he had been "informed" that "the run sheets which should exist for anyone transported to a hospital by the Village of Yorkville Volunteer Fire Department EMS, cannot be

70

located for three of four persons transported on April 18, 2010, including the run sheets for

Defendant Klubert and Plaintiff." (*Id.*). Defense counsel simply explained that, because they

were missing, the run sheets could not be produced. (*Id.*).

### b. Embezzlement-Related Documents

Defense counsel also failed to investigate Defendants' contention that they were unable

to produce information concerning Mrs. Klubert's embezzlement because that information

belonged solely to the Back Room Club. Defense counsel first argued that Defendants were

unable to produce the embezzlement-related documents in the Opposition to Plaintiff's Motion

for Leave to Conduct Supplemental Discovery, attaching Mayor Closser's declaration in support.

(Doc. 178 at 4 ("[I]t is important to understand that the alleged embezzlement . . . is an issue

between Mrs. Klubert and the Back Room Club."). It bears repeating that Mayor Closser swore

that:

> 2.    Members of the Yorkville Fire Department privately raise money for the fire department in what is known as the Back Room Club.
> 3.    The Village has no involvement in the collection, saving, or spending of the privately raised Back Room Club money.
> 4.    [He] underst[ood] that Valerie Klubert owed money to the Back Room Club.
> 5.    In 2014, the Back Room Club addressed the issue of money owed with Valerie Klubert, independent of the Village of Yorkville, and entered into an agreement for Mrs. Klubert to pay back money to the Back Room Club.
> 6.    The Village of Yorkville had no involvement in the Back Room Club's decision as to how to handle the matter of money owed by Valerie Klubert.
> 7.    The Village of Yorkville had no involvement in whether Valerie Klubert should or should not be prosecuted in regard to the money owed to the Back Room Club.

(Doc. 178-1). The Court disagreed and allowed the discovery to proceed (Doc. 191), a decision

that was upheld over defense counsel's objection (Docs. 227; 194). Despite this, defense counsel

remained steadfast in his position that his clients could not, and would not, produce the

discovery—making baseless objections, defending Mayor Closser's fabricated notes as a legitimate source of information, and providing inadequate answers to the Court's questions during oral argument.

### i.     Baseless Objections And Defense Of Mayor Closser's Fabricated Notes

As the Court discussed *supra* (at p. 58–60), defense counsel made baseless objections to written discovery and during depositions.  Defense counsel's objections even asserted privilege on behalf of the Back Room Club, despite representing in every other instance he could not speak for that entity.  *See supra* (at p. 32) (stating that audit documents "may be subject to attorney-client privilege concerning Mr. Battistel and the Back Room Club").

Defense counsel also defended Mayor Closser's fabricated notes as a legitimate source of information.  (*See* Doc. 324, PAGEID #: 10276 (noting changes but refusing to admit that they were material)).  For example, when faced with the Second Motion to Compel and for Sanctions, defense counsel claimed full compliance with the supplemental discovery requests, despite producing just two documents, an unsigned and undated agreement and Mayor Closser's fabricated notes.  (*See* Doc. 258 at 3–4).  This was a critical time in this case—the original notes were missing and the Court and Plaintiff's counsel had inquired on many occasions what was being done to search for them.  (*See, e.g.*, Doc. 257, PAGEID #: 8857).  Despite this, defense counsel's representations to the Court merely reiterated Mayor Closser's deposition testimony— that he had "prepared the typed version of his notes simply because he was concerned about the legibility of his handwriting and whether he and others would even be able to read" them.  (*Id.* at 4).  Defense counsel's lack of investigation and oversight are evident in his declaration that Mayor Closser "did not consult with anyone regarding his decision to type the notes."  (*Id.*).

72

Admitting that his client did not consult with him is not a defense—it is an admission that defense counsel was not properly investigating.

Moreover, if defense counsel noted the material differences between the fabricated notes and the handwritten notes, he refused to admit it to this Court.  When defense counsel ultimately filed the handwritten notes, he did so without acknowledging the differences between them.  (*See* Doc. 275).  To the contrary, defense counsel's memorandum in support could mislead one into believing the documents were substantively the same.  (*See* Doc. 275-1, PAGEID #: 9328).  Defense counsel simply stated, "The Court will see that Defendants have now attached the 4/13/2014 handwritten notes of Blair Closser which have been at issue in this case."  (*Id.*).

Defense counsel's unwillingness to recognize the material differences between the fabricated notes and the handwritten notes is abundantly clear in his decision to use the fabricated notes to prepare Mr. Battistel for his deposition on June 15, 2016—over two months after the handwritten notes were submitted to the Court.  (Doc. 300-1, PAGEID #: 9635).  Specifically, Mr. Battistel testified that he met with defense counsel at his office the day before his deposition and defense counsel provided him with just two documents—minutes from a Back Room Club meeting and the typewritten notes.  (*Id.*).  When asked if he had ever seen Mayor Closser's handwritten notes, Mr. Battistel testified "I know that Mr. Stoffers had them, but I didn't see them."  (*Id.*).  Given the totality of the circumstances, the Court concludes that defense counsel's decision to use the typewritten notes in June 2016 was more than a failure to recognize the material differences—it was an overt effort to bolster his clients' basis for discovery non-compliance.

### ii.    Oral Argument

As one would imagine, the Court had a number of questions for defense counsel at oral

argument.  First, the Court asked defense counsel about the legibility of the notes:

> THE COURT:  Do you agree that Mayor Closser's notes, the handwritten version,
> they are legible?  Do you agree that they are legible?
> MR. STOFFERS:  Yes.

(Doc. 324, PAGEID #: 10278).  Next, the Court asked defense counsel about the actions he took

in relation to the search for the handwritten notes. Defense counsel could not state what

communications he had with Mayor Closser about the notes between April 1, 2016, the date of

Mayor Closser's deposition, and April 14, 2016, the date counsel claims to have received them.

(*Id*., PAGEID #: 10279–80).  Most significantly, when the Court asked defense counsel about the

relationship between the Fire Department and the Back Room Club, defense counsel continued

to argue that his clients had no ability to produce the requested documents.  He stated:

> I agree [the] terms [Fire Department and Back Room Club] are used
> interchangeably, but that doesn't mean that the Back Room Club doesn't operate
> separately from the Village. Unfortunately, they talk about it, you know, both
> ways in the Village itself, but that doesn't mean that the Village and the Back
> Room does not operate separately. I think that's borne out when we produced the
> minutes of the meeting in May of 2014 when the Back Room Club decided what
> they were going to do with Mrs. Klubert. And everybody testified that was the
> Back Room Club's decision, the Village had no involvement in that decision. It
> was the Back Room Club's money. So, yes, the terms, they use interchangeably,
> but in terms of how they operate, the Back Room Club operates separately from
> the Village, which is borne out by their meeting of what to do with Mrs. Klubert.

(Doc. 324, PAGEID 10267–68).  But when the Court questioned defense counsel about the legal

basis for the alleged impediment preventing his clients from accessing the documents housed in

the Fire Department, he struggled to answer.  Defense counsel argued that the Back Room Club

was a *de facto* corporation but, when pressed, admitted that he hadn't investigated whether the

prongs required to make a *de facto* corporation had been satisfied.  (*Id*., PAGEID #: 10270–71).

74

Defense counsel also struggled to answer questions about the factual basis to support the alleged legal inability to access Back Room Club documents. When asked why the Back Room Club's Citizens Bank statement was addressed to "The Village of Yorkville dba Yorkville Fire Department Backroom" (*see* Doc. 307-4, PAGEID #: 10023), defense counsel admitted that he "[did]n't know" and didn't investigate. (Doc. 324, PAGEID 10271–72). Defense counsel also admitted that the Back Room Club chooses the members of the Fire Department; the Back Room Club and the Fire Department had comingled funds; and the Village Solicitor facilitated the response to Plaintiff's subpoena to the Back Room Club. (*Id.*, PAGEID 10272–73). On the final point, defense counsel explained that the Village Solicitor did so at defense counsel's request because defense counsel agreed to help with the production. (*Id.*, PAGEID 10273–74).

If the Back Room Club were truly a separate entity, how could the Village facilitate the response to the subpoena? Defense counsel has not shown a single legal or factual impediment that prohibited Defendants from producing information concerning Mrs. Klubert's embezzlement, arguing only that "the Village officials *felt* [the Back Room Club] was a separate entity." (*Id.*, PAGEID #: 10299 (emphasis added)). Their feeling wasn't enough. If Defendants failed to produce discovery because the Back Room Club was purportedly separate, defense counsel needed to prove it. *See Laukus,* 292 F.R.D. at 500 (citing *Reg'l Refuse Sys. v. Inland Reclamation Co.,* 842 F.2d 150, 154 (6th Cir. 1988) ("The burden to prove that the failure to comply with discovery obligations was the result of inability and not due to willfulness, bad faith or fault rests with the sanctioned party.")).

### 2. Oversight

Perhaps if defense counsel had provided sufficient oversight of the discovery process from the beginning, we would not be at this point. In addition to a duty to investigate, defense

counsel has an affirmative obligation to work with his clients to plan and execute a thorough search designed to produce any and all responsive documents. *See, e.g.*, *Bratka*, 164 F.R.D. at 461 ("[T]rial counsel must exercise some degree of oversight to ensure that their client's employees are acting competently, diligently and ethically in order to fulfill their responsibility to the Court.").  In this case, defense counsel appears to have simply sent the requests to the Village, without working in conjunction with his clients to identify individuals with knowledge about responsive documents, to determine the scope of responsive documents, or to discover where the documents might be kept.

In fact, many Village officials who were in a position to search for and locate responsive documents were never asked to look for them.  For example, Mayor Closser testified that he didn't search for any documents.  (Doc. 278-3, PAGEID #: 9503).  Mr. Goolie, a Village Council Member and Fire Department Member, testified that no one had ever asked him to look for or produce any documents in this case, and the first time he did so was in response to Plaintiff's subpoena served in May 2016.  (Doc. 302-1, PAGEID #: 9906).  Similarly, Mr. Copeland, who wore many hats at the Village as EMS Chief, Village Fire Department Member, and Village Police Officer, testified that he had never been asked to search for any documents in this case and did not so until subpoenaed in June 2016.  (Doc. 301-1, PAGEID #: 9720–21).  By then, however, it was too late—the run sheets and the audit records had disappeared.  Thus, defense counsel's belated request was tantamount to not asking at all.

### 3. Preservation

Further, this series of events directly invokes a critical aspect to discovery in every case—the duty to preserve.  The duty to preserve does not reside with clients alone.  *See Tellermate*, 2014 WL 2987051, at *19–20.  It is also counsel's duty, which requires more than

the issuance of a general directive to preserve documents at the beginning of a case. *See id.* Rather, counsel has an "affirmative obligation to speak with the key players" to "preserve . . . the sources of discoverable information." *Id.*

As set forth above, defense counsel took little or no action to prevent the disappearance of documents. The Court questioned defense counsel about preservation related to the supplemental discovery at the hearing. Defense counsel responded that he "didn't specifically tell anybody to preserve documents" but sent a form letter in 2011 at the outset of this litigation. (Doc. 324 PAGEID #: 10266-67). With years passing and personnel changes occurring, the form letter was far from a meaningful effort to ensure preservation.

### 4. Cooperation And Transparency

Finally, defense counsel's overall approach to discovery was inconsistent with his duty to cooperate and be transparent about how information could be retrieved. *Tellermate*, 2014 WL 2987051, at *1. In stark contrast to that duty, defense counsel argued repeatedly that some discovery on a given topic was enough, regardless of his client's noncompliance with Court Orders.

For example, in the Motion for Reconsideration of the Opinion and Order granting Plaintiff's Motion to Compel, defense counsel argued that because Plaintiff deposed two people with knowledge, was provided the names of present EMS Members and other Village Fire Department Members, had hospital records that "should contain" some information about pre-hospital treatment, and had some specific information regarding the transport on the day of the fire, the Motion to Compel should have been denied. (Doc. 51 at 7). Similarly, defense counsel argued that, because the embezzlement-related documents were missing, Plaintiff should simply recreate the audit himself. (*See* Doc. 324, PAGEID #: 10265). He stated, "it would seem to

me . . . that the same thing could have been done here that the Back Room Club did back in 2014, which is to go get the records from the bank, which is what Mr. Battistel, Mr. Copeland looked at to perform an investigation to determine whether Mrs. Klubert took money and how much." (*Id.*). As Plaintiff explained, simply because he may be able to obtain some information from other sources does not justify Defendants' refusal to produce discoverable documents. (Doc. 55 at 2). Plaintiff is correct. *See Tellermate*, 2014 WL 2987051, at *4 "(stating that "any competent practitioner would know" that reason does "not justify a party's refusal to provide responsive information over which it has control"). Thus, monetary sanctions are also appropriate given defense counsel's failure to satisfy his duty to cooperate and be transparent.

Based upon the totality of the circumstances, the Court concludes that defense counsel assisted his clients' efforts to thwart discovery. Therefore, monetary sanctions against counsel are warranted. *See Tellermate*, 2014 WL 2987051, at *1. Defense counsel shall pay jointly and severally with his clients for the reasonable attorney's fees and costs incurring in connection with the Motion for Sanctions. S*ee id.*, 2014 WL 2987051, at *26; *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 527 (2d Cir. 1990) (affirming decision to hold client and counsel liable for the failure to comply with discovery requests and court orders); *Weisberg v. Webster*, 749 F.2d 864, 873–74 (D.C. Cir. 1984) ("The trial court is in the best position to judge how much responsibility is due to the client's recalcitrance and how much to the lawyer's condonance or participation in the client's disobedience.").

## III.    CONCLUSION

The American legal system is unique. We trust one another to engage meaningfully in the process so that the truth may be uncovered through transparent, cooperative discovery. If discovery unfolds as intended, little, if any, Court intervention is needed. Here, Defendants,

facilitated by counsel, stymied that open process.  Defendants first refused to give Plaintiff any information on relevant issues and then, only after Court intervention, cracked open the door to discovery ever so slightly.  Despite Plaintiff's and this Court's repeated efforts, little was discovered on critical issues needed to prove Plaintiff's case and to impeach key defense witnesses.  Defendants destroyed or lost documents, withheld or unreasonably delayed productions, and even fabricated evidence.  As the protector of everyone's fair day in Court, the judiciary cannot turn a blind eye when a party violates the trust we have placed in one another to be transparent and cooperative.  In this case, the discovery process has been so perverted that it would be unjust to require Plaintiff to prove Defendants' liability at trial.

For the reasons set forth above, Defendants' Motion for Leave to file a Supplemental Memorandum in Opposition is GRANTED (Doc. 275), the Motion to Compel Discovery is DENIED as MOOT (Doc. 241), and it is RECOMMENDED that the Motion for Sanctions be GRANTED (*id*.), and that default judgment on liability be entered as to all Defendants, with the exception of Police Chief Morelli.  Finally, Defendants and their counsel are ORDERED to pay jointly and severally the reasonable expenses, including attorney's fees, incurred in connection with the Motion for Sanctions.

<div align="center">Procedure on Objections to Order</div>

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge.  28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5.  The motion must specifically designate the order or part in question and the basis for any objection.  Responses to objections are due fourteen days after objections are filed and replies by the objecting party are

due seven days thereafter.  The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This Order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge.  S.D. Ohio L.R. 72.3.

<u>Procedure on Objections to Report and Recommendation</u>

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A Judge of this Court shall make a *de novo* determination of those portions of the Report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date:  December 22, 2016                          /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE